STATE OF CONNECTICUT *v.* DANIEL JONES
(12784)

PETERS, C. J., HEALEY, GLASS, COVELLO and HULL, Js.

Argued October 1—decision released December 29, 1987

*Timothy H. Everett,* for the appellant (defendant).

*Susann E. Gill,* deputy assistant state's attorney, with whom were *John Malone,* assistant state's attorney, and, on the brief, *Jack Fischer, Alice Osedach* and *Nancy Gillespie,* legal interns, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, Daniel Jones, was found guilty on July 2, 1984, after a jury trial, of the crime of felony murder in violation of General Statutes §§ 53a-54c and 53a-54a (c).[1]

On April 2, 1982, seventy-five year old Theodore McInnis reported for his job as a boiler attendant on

---

[1] General Statutes § 53a-54c, entitled "Felony Murder," provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

General Statutes § 53a-54a (c) provides: "Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

the 3 to 11 p.m. shift at St. Joseph's Cathedral in Hartford. During that shift, McInnis was encountered and attacked by the defendant, Floyd Simms and Waymon Mohagel. During that attack, his key ring, watch and ring were stolen. McInnis' body was discovered on the morning of April 3, 1982.

On April 26, 1982, Jones was already in custody on unrelated charges when he was arraigned on the felony murder charge in Superior Court, geographical area No. 14. While in custody and before the case was transferred to part A of the Hartford Superior Court, he gave statements to the police on three separate occasions—April 20, April 21 and April 28, 1982. Thereafter, the defendant was presented before a grand jury, which returned an indictment against him on June 30, 1982, charging him with felony murder in violation of General Statutes §§ 53a-54c and 53a-54a (c). At the defendant's trial, Mohagel testified for the state[2] providing crucial evidence against the defendant. A jury found the defendant guilty as charged.

On appeal, the defendant claims that the trial court erred in: (1) admitting his April 28, 1982 statement, which was allegedly obtained in violation of his fifth and sixth amendment rights under the federal constitution, as well as his state constitutional rights; (2) admitting inflammatory "other crimes" evidence on common scheme grounds, thus prejudicing the jury because that evidence did not manifest a "unique pattern" or bear "striking similarity" to the crime

---

[2] In October, 1983, Simms was convicted, after a jury trial, of felony murder for his part in the McInnis homicide. This court later upheld that conviction. *State* v. *Simms,* 201 Conn. 395, 518 A.2d 35 (1986).

After Simms' conviction, Mohagel, who had also been indicted for felony murder, gave a statement to the police and agreed to testify against the defendant in exchange for his guilty plea to a reduced charge of conspiracy to commit robbery in the first degree, with a ten year recommended sentence and the dismissal of other charges also pending against him. Mohagel gave his statement to the police and "got" a plea bargain in October, 1983.

charged; (3) abusing its discretion by permitting the state on redirect examination to examine Mohagel in detail about four additional criminal acts that the defendant committed; and (4) denying his constitutional right of confrontation by refusing to permit him to impeach Mohagel concerning an undisclosed felony underlying an earlier youthful offender adjudication of Mohagel. We find no error.

## I

We first address the defendant's claim that his federal and state constitutional rights[3] to counsel and to remain silent were violated when, after the initiation

---

[3] The fifth amendment to the United States constitution provides: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use, without just compensation."

The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

The defendant also asserts the denial of his state constitutional right to counsel and denies having waived that right. In doing so, he refers, in his main brief, to the constitution of Connecticut, article first, §§ 7, 8 and 9. The defendant's brief provides no analysis as to why the rights afforded him by the federal and state constitutions are meaningfully distinguishable with respect to the substantive issues he has raised and asserted on those claims. The state, in its brief, understandably does not discuss the meager assertion of the defendant's state constitutional rights in his brief.

The defendant, however, does, in his reply brief, endeavor to address his claim under article first, § 8, of the constitution of Connecticut. He makes no reference at all to his earlier asserted claims under the constitution of Connecticut, article first, §§ 7 and 9, and, so, these are clearly abandoned. There is no question that "we recognize that the *Miranda* warnings; *Miranda* v. *Arizona*, 384 U.S. 436, 463–65, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); have come to have an independent significance under our state constitution; Conn. Const., art. I, § 8; *State* v. *Falby*, 187 Conn. 6, 11 n.1, 444 A.2d 213 (1982); see *State* v. *Chung*, 202 Conn. 39, 45 n.7, 519 A.2d 1175 (1987) . . . . " *State* v. *Evans*, 203 Conn. 212, 218 n.6, 523 A.2d 1306

of adversarial judicial criminal proceedings, a police officer, with the permission of the prosecuting attorney, met with him and interrogated him. We do not agree.

This claim of error is addressed to the trial court's admission into evidence, after a midtrial suppression hearing, of the defendant's statement made in jail to Detective James Malcolm of the Hartford police department on April 28, 1982. The defendant claims that the evidence at that hearing does not support the finding that he knowingly, intelligently and voluntarily waived his sixth amendment right to counsel following the initiation of adversarial judicial criminal proceedings. He also makes a distinct claim that the record does not demonstrate such a waiver of his fifth amendment right to remain silent. Arguing that the presumption against waiver of constitutional rights applies "discretely" to his sixth amendment right to counsel and to his *Miranda* rights; *Miranda* v. *Arizona,* 384 U.S. 436, 463–65, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); he claims that Malcolm met with him in jail on April 28, 1982, in order to interrogate him concerning this crime.

(1987). This is in keeping with our view of our state constitution. See, e.g., *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985); *Horton* v. *Meskill,* 172 Conn. 615, 641–42, 376 A.2d 359 (1977).

We make only two observations about the defendant's discussion of the state constitutional issue in his reply brief. First, he seems to claim that we ought to require a higher standard of waiver for *Miranda* rights than heretofore. Yet, he elucidates no analysis in that regard except to say that "[i]deally," waiver should be in the presence of a neutral magistrate or the defendant's lawyer and that "[m]inimally," it should be executed unambiguously and preserved on tape, videotape or in writing. We decline to take that step in this case. Second, the circumstances of this case, including the conduct of the defendant and the police, are such that the rights claimed to have been violated were "scrupulously honored" under even a more liberal standard than that required by the United States constitution. The defendant's discussion of Connecticut's long record of according counsel to indigent criminal defendants, upon which he premises his claimed state constitutional violations, is not apposite insofar as that affects the substantive issues he raises.

The defendant also claims that Malcolm did so without clarifying for him the consequences of what he maintains was the invocation of his constitutional rights to silence and counsel. Sensing some problem about whether he or Malcolm was the one who "initiated" the discussions leading to his incriminatory statements of April 28, 1982, the defendant claims that while he may have "invited the [jail] meeting" with Malcolm "in a general sense" by having telephoned Malcolm on April 27, 1982, and asking to see Malcolm, he, nevertheless, did not invite Malcolm's interrogation at their meeting.

The state, on the other hand, claims that the record amply supports the trial court's finding that the defendant made a knowing, intelligent and voluntary waiver of his fifth and sixth amendment rights so that the defendant's statements to Malcolm on April 28, 1982, were properly admitted at the trial. We agree with the state.

In order properly to pass upon the claims of the parties and the action of the trial court at the suppression hearing concerning the April 28, 1982 statement of the defendant, certain circumstances should first be set out. On that date, the defendant was nineteen years of age, could read and write and had completed the eleventh grade. He had been in jail since April 20, 1982,[4] for the charge of burglary in the first degree and assault. On April 20, 1982, he had given a written statement concerning that incident after having waived his *Miranda* rights in writing, and he subsequently gave a second written statement on April 21, 1982, concerning the same incident after again executing a written waiver of newly administered *Miranda* warnings. Hartford detectives James Malcolm and Paul Vanderheiden were

---

[4] His arrest on April 20, 1982, was for his participation in the burglary of a home for retarded persons on Marshall Street in Hartford on April 10, 1982.

the officers who obtained the April 21, 1982 statement from the defendant and they ascertained at that time that he understood his *Miranda* rights when he waived them. On April 21, 1982, the defendant admitted to these detectives that he had lied in his statement of the previous day as to who was responsible for the robberies in the cathedral, that he was involved in the April 8, 1982 mugging in the cathedral of a ninety year old man and that he "believed" that Simms and Mohagel were responsible for the McInnis homicide.[5]

The evidence at the suppression hearing also disclosed that the defendant had been arraigned before the Superior Court, *Tamborra, J.,* on April 26, 1982, on the charge of felony murder. At that time, the state requested that the court give a "special advisement on a lawyer." The court proceeded to do so, advising the defendant of his fifth and sixth amendment rights, including his right to be "represented by [his] own attorney while [being questioned] by the police and at all other times."[6] On that occasion, the court appointed

---

[5] At the trial, Malcolm testified before the jury as to these admissions of the defendant on April 21, 1982. The denial of the defendant's motion to suppress those admissions has not been claimed as error on this appeal.

[6] In response to the state's request, the court, *Tamborra, J.,* informed the defendant as follows:

"The Court: If you will pay attention, Mr. Jones, I want to advise you of your Constitutional Rights. You're charged in two informations, one robbery in the first degree and assault in the first degree. And a second information charging felony murder.

"You have a right to remain silent. Any statement that you do make may be used against you. You have a right to be represented by your own attorney while questioning by police and at all other times.

"If you desire to make a statement, you have a right to have your attorney present while you are making that statement. If you do make a statement, you may stop making that statement at anytime that you desire to.

"If you cannot afford an attorney, you may make an application for the public defender. And if you're found eligible, the Court will appoint the public defender to represent you at no cost to you.

"You have a right to be released on bail in a reasonable amount to guarantee your appearance in court when your case is continued."

a public defender to represent the defendant for bond purposes only because of certain representations made to the court by the defendant's mother, who was present. She said that she was attempting to obtain private counsel for her son, and, because she had been unsuccessful, she requested, and was given, a continuance.

On the morning of April 27, 1982, the defendant telephoned Malcolm from the jail and asked him to come to see him that night after the defendant had returned from a scheduled court appearance that day. At that time, Malcolm informed the defendant that "he [the defendant] did not have to speak with [Malcolm] and if wanted, he [the defendant] could have his lawyer there during the questioning or the interview." The defendant responded, according to Malcolm, by saying, "I still want to talk to you." Malcolm indicated to the defendant that he "would be willing to talk to him." Malcolm then telephoned an assistant state's attorney, discussed the defendant's request and asked if it was "okay to go over and see [the defendant]."

On the morning of April 28, 1982, Malcolm did go to the jail alone to see the defendant. Upon his arrival, Malcolm had to sign a form requesting to see the defendant, which then had to be taken to the defendant for his consent to the interview. When the defendant came to the interview room, Malcolm advised him of his *Miranda* rights from the same card that was used previously and ascertained that the defendant understood them. The defendant, however, refused to sign a written waiver of those rights. Asked if he would give a written statement, the defendant said that he would not. Malcolm said that the defendant told him that his mother was going to get an attorney from New Haven. Malcolm, who knew that the defendant had been arraigned, presumed that he had the services of a public defender. He told the defendant that the defendant

"could have him here with us during this interview." The defendant understood that and said that his "attorney had told [him] not to sign anything and not to talk to any police officer." Once the defendant said that to Malcolm, the detective "got up and attempted to leave."

At that point, the defendant asked Malcolm to sit down and stated that he "wanted to talk to [Malcolm] about the homicide." Once again, he was advised of his *Miranda* rights from the same card and he again stated that he understood them. Upon being asked if he would waive those rights and give a written statement, the defendant said that his "lawyer had told [him] not to sign anything and not to talk to any police officer." Malcolm then folded up the notebook that he had in his hand and started for a second time to go toward the door of the interview room. Without any inquiry from Malcolm, Jones asked "which *one* of them put the blame on [me]?" (Emphasis added.) In replying to the defendant, Malcolm said that only two parties had been arrested for felony murder.[7] After telling the defendant that, Malcolm then read to the defendant those parts of Simms' statement "involving [the defendant]." When he finished, the defendant asked to read the statement himself, whereupon Malcolm handed it to him and the defendant read it himself. Simms' statement not only implicated the defendant in other crimes but implicated him in the felony murder of McInnis.

---

[7] Malcolm testified that at that particular time, he knew that only two persons, Simms and the defendant, were under arrest for the homicide. In oral argument before us, the defendant asserted that this was factually incorrect, claiming that on April 28, 1982, the day that Malcolm visited the defendant in the jail, the state's witness, Mohagel had been presented in court on the charge of felony murder. Even if this is assumed to be true, it is hardly critical with respect to the suppression issue. Malcolm was never asked at the suppression hearing whether he actually knew that Mohagel had also been arrested on the felony murder charge.

When the defendant had completed reading the statement, he volunteered certain observations concerning its contents. He said that it was Simms, not he, who, on a different occasion, had been the one who had hit an old man (William McGee) who had been praying in the cathedral, although he did admit that he and Mohagel had been present at the time. He admitted that he, Simms and Mohagel had begun "doing the muggings" about the first week of April, 1982. In addition, he denied Simms' statement that he had worn Simms' vest on the night of the homicide and that he had borrowed Simms' black suede sneakers with orange laces.[8] Rather, he said that Simms had given him a pair of blue sneakers.

After the defendant had made these statements, Malcolm then asked him if he had ever seen Simms with a large key ring. The defendant responded that Simms "always had a large key ring . . . a lot of keys with him." He then asked the defendant "to describe how they killed the old man." The defendant responded that he could not tell Malcolm his involvement at that time in the homicide, but that he would contact his lawyer. Then, without any intervening question of him by Malcolm, the defendant stated that "Floyd [Simms], Raymond [sic] [Mohagel] and [himself] were involved and were present during the time the homicide went down."[9] At that juncture, the defendant said that he "wanted to contact [his] lawyer," the interview ended and Malcolm left.

The right to counsel is guaranteed by both the fifth and sixth amendments to the United States constitu-

---

[8] Forensic evidence at the trial indicated that an expert had found "microscopic consistency" between fibers taken from the shirt of the victim and fibers on the bottom of one of Simms' sneakers.

[9] During the suppression hearing, Malcolm was asked if the defendant used the word "homicide" at this point. Malcolm replied: "I believe [the defendant] says: 'When the old man got killed.' "

tion. The sixth amendment accords the right of an "accused" to the assistance of counsel in "all criminal prosecutions"; this right attaches "only at or after the time that adversary judicial proceedings have been initiated . . . . " *Kirby* v. *Illinois,* 406 U.S. 682, 688, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); *United States* v. *Gouveia,* 467 U.S. 180, 190, 104 S. Ct. 2292, 81 L. Ed. 2d 146 (1984); *Brewer* v. *Williams,* 430 U.S. 387, 401, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977); *State* v. *Shifflett,* 199 Conn. 718, 726 n.1, 508 A.2d 748 (1986); *State* v. *Falcon,* 196 Conn. 557, 560–61, 494 A.2d 1190 (1985); *State* v. *Ferrell,* 191 Conn. 37, 44 n.10, 463 A.2d 573 (1983). "It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Kirby* v. *Illinois,* supra, 690.

The state in this case acknowledges, as it must, that the defendant's sixth amendment right to counsel attached at the time of his April 26, 1982 arraignment on the charge of felony murder. The state also recognizes that, because the defendant did assert his desire for counsel at this arraignment hearing, the sixth amendment prohibited the state from initiating interrogation or intentionally creating a situation likely to induce the defendant to make incriminating statements without the assistance of his counsel. *Michigan* v. *Jackson,* 475 U.S. 625, 635, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986); see *Henry* v. *United States,* 447 U.S. 264, 275, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980). On the other hand, the fifth amendment, unlike the sixth amendment, contains no explicit language providing for the right to counsel. The United States Supreme Court, however, held in *Miranda* that such a right was necessary to protect an accused's fifth amendment privilege against compelled self-incrimination during custodial interrogation. *Miranda* v. *Arizona,* supra, 469–70; see *Michigan* v. *Jackson,* supra, 629; *Edwards*

v. *Arizona,* 451 U.S. 477, 485–86, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). Thus, "[t]he Sixth Amendment right to counsel is analytically distinct from the Fifth Amendment right created by *Miranda. Rhode Island* v. *Innis,* 446 U.S. 291, 300 n.4, 100 S. Ct. 1682, 1689 n.4, 64 L. Ed. 2d 297 (1980)." *United States* v. *Karr,* 742 F.2d 493, 495 (9th Cir. 1984). The defendant's request for an attorney at the arraignment was an invocation of only his sixth amendment right to counsel and not of his fifth amendment right to counsel.

*Edwards* v. *Arizona,* supra, was a fifth amendment case. In *Edwards,* the United States Supreme Court held that an accused in custody who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards* v. *Arizona,* supra, 484–85; see *Solem* v. *Stumes,* 465 U.S. 638, 104 S. Ct. 1338, 79 L. Ed. 2d 579 (1984). In *Edwards,* the request for counsel was made to the police during custodial interrogation and the basis for the holding was the fifth amendment privilege against compelled self-incrimination. *Michigan* v. *Jackson,* supra, 630.

Several years later, drawing on *Edwards,* the United States Supreme Court, in *Michigan* v. *Jackson,* supra, set out a new test to be used in determining the validity of a defendant's waiver of his sixth amendment right to the assistance of counsel. *Jackson* held that if the police initiate interrogation after a defendant asserts, "at an arraignment or similar proceeding," his sixth amendment right to counsel, any waiver of that right for that "police-initiated" interrogation is invalid. Id., 636. In applying the rule of *Edwards* to the sixth amendment right, the *Jackson* majority said that "the Sixth Amendment right to counsel at a postarraign-

ment interrogation requires *at least as much protection* as the Fifth Amendment right to counsel at any custodial interrogation." (Emphasis added.) Id., 632.

On the issue of waiver, the *Jackson* majority, after reiterating the indulgence of every reasonable presumption against the waiver of fundamental constitutional rights rule of *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938), with its attendant burden of establishing waiver on the prosecution; see *Brewer* v. *Williams,* supra, 404; addressed the nature of the interpretation of a defendant's request for counsel. *Michigan* v. *Jackson,* supra, 633. The "settled approach," illustrated by the references to *Zerbst* and *Brewer,* "require[d]" the *Jackson* court to "give a broad, rather than a narrow, interpretation to a defendant's request for counsel—we presume that the defendant requests the lawyer's services at every critical stage of the prosecution." Id. Moreover, in *Jackson,* the state of Michigan maintained that the defendants had made a valid waiver of their sixth amendment rights by signing a postarraignment confession after again being advised of their constitutional rights. In refusing to accept this argument, the *Jackson* court pointed out that in *Edwards,* "we rejected the notion that, after a suspect's request for counsel, advice of rights and acquiescence in police-initiated questioning could establish a valid waiver." Id., 635. It went on to say: "Just as written waivers are insufficient to justify police-initiated interrogations after the request for counsel in a Fifth Amendment analysis, so too they are insufficient to justify police-initiated interrogations after the request for counsel in a Sixth Amendment analysis." Id.

Turning to the sixth amendment context of this case, we agree that the record supports the trial court's conclusions that the defendant was the one who requested that Malcolm come to the jail to see him on April 28,

1982. We also agree with its conclusion that, at the jail, the defendant "initiated" further communications, exchanges or conversations with the police and validly waived his sixth amendment right to the assistance of counsel.

It is evident from what we have already set out that this defendant had received and waived *Miranda* warnings more than once. Moreover, he had received the "special advisement on a lawyer" at his arraignment only two days earlier. There can be no question that he solicited and requested that Malcolm come to the jail to see him. Malcolm, with the knowledge he had, promptly and correctly told the defendant that he did not have to talk to him and that he could have his lawyer with him during the questioning at the interview. The defendant, nevertheless, said that he still wanted to talk to him. Malcolm's call to the state's attorney, as the result of the defendant's call to him, indicates Malcolm's sensitivity, not only to moving cautiously, but also to the recognition that undertaking a jail visit generated by a person arraigned on the charge of felony murder implicated that person's fundamental constitutional rights. It would be illusory to say that Malcolm was not interested in obtaining information about this crime from the defendant, but this record bears out that Malcolm carefully endeavored to insulate his police activity from illegal taint. That the defendant remained intent on seeing and talking to Malcolm is further indicated by the fact that when Malcolm arrived at the jail, the defendant still had to sign a form consenting to see Malcolm when the latter arrived.

When the defendant first appeared in the interview room, Malcolm promptly again advised him of his *Miranda* rights and ascertained that the defendant understood them.[10] When Malcolm asked the defend-

---

[10] The defendant, however, would not sign a written waiver of his *Miranda* rights. That fact alone does not prevent a finding that an accused did prop-

ant if he would give a written statement, the defendant said that his attorney had told him not to sign anything and not to talk to any police officer. The defendant was aware of his rights and obviously knew when to invoke them. Malcolm made no further inquiry to dissuade the defendant, but, rather, he attempted to leave because, as a police officer, he knew that the interview was being terminated.

The defendant, at his own instance, then asked Malcolm to sit down and said that he "wanted to talk to [Malcolm] about the homicide." Malcolm prudentially then again informed the defendant of his rights and again ascertained that he understood them. The defendant once again displayed that he knew how to invoke his rights when he again refused to sign a written statement upon Malcolm's request, stating again that his lawyer had told him not to sign anything and not to talk to any police officer. Malcolm then folded up his notebook and started to go toward the door of the interview room. Without more, the defendant asked Malcolm "which one" put the blame on him. There can be no question about what the defendant meant and what he wanted to find out. This direct question was the initiation by him of "further communication[s], exchanges or conversation with the police," about the homicide with which he was charged, after he had invoked his right to counsel and to remain silent. *Michigan* v. *Jackson,* supra; *Oregon* v. *Bradshaw,* 462 U.S. 1039, 1044, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983); *Edwards* v. *Arizona,* supra, 485; *State* v. *Evans,* 203 Conn. 212, 224, 523 A.2d 1306 (1987). This was no inquiry "relating to routine incidents of the custodial relationship"

erly waive such rights if all the circumstances justify such a finding. See, e.g., *State* v. *Shifflett,* 199 Conn. 718, 732, 508 A.2d 748 (1986); *State* v. *Harris,* 188 Conn. 574, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983); *State* v. *Frazier,* 185 Conn. 211, 226-27, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982).

which will generally not "initiate" a conversation as that term was used in *Edwards. Oregon* v. *Bradshaw,* supra, 1045. Malcolm could reasonably have interpreted that unambiguous question to relate directly to the investigation of the felony murder of McInnis. *State* v. *Evans,* supra. This was no unfocused and ambiguous inquiry by an uncounseled defendant. Given all the circumstances, Malcolm did not have to clarify the defendant's comprehension of his rights including their waiver before proceeding any further.

We are aware that waiver presents a factual issue. Despite this, " 'our usual deference to the finding of the trial court on questions of this nature is qualified by the necessity for a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence. . . .' " (Citations omitted.) *State* v. *Toste,* 198 Conn. 573, 580, 504 A.2d 1036 (1986). The trial court's ruling satisfies this standard. The totality of the circumstances demonstrates that the defendant voluntarily waived his sixth amendment right to deal with the police through counsel and that he made that waiver " 'with a full awareness both of the nature of the right being abandoned and the consequences of [his] decision to abandon it.' " *Colorado* v. *Spring,* 479 U.S. 564, 573, 107 S. Ct. 851, 93 L. Ed. 2d 954 (1987); *Moran* v. *Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986); *Johnson* v. *Zerbst,* supra, 464. His decision to relinquish this protection was, on this record, voluntary; i.e., it was the product of a free and deliberate choice rather than intimidation, coercion or deception. *Edwards* v. *Arizona,* supra. Only last year, the United States Supreme Court said that it had "never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self interest in deciding whether to speak or stand by his rights. See, e.g., *Oregon* v. *Elstad,* [470 U.S. 298, 316–17, 105 S.

Ct. 1285, 84 L. Ed. 2d 222 (1985)]; *United States* v. *Washington,* [431 U.S. 181, 188, 97 S. Ct. 1814, 52 L. Ed. 2d 238 (1977)] . . . *McMann* v. *Richardson,* [397 U.S. 759, 769, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970)]." *Moran* v. *Burbine,* supra, 422. Malcolm had been scrupulously careful not to interrogate Jones until there had been a valid waiver of his sixth amendment right to counsel. We therefore have no difficulty in agreeing with the trial court that this right was validly waived.[11]

[11] The defendant argues that we should recognize "a higher standard of waiver" for the waiver of the sixth amendment right to counsel than for the waiver of the fifth amendment right to counsel. Here, he argues that *Michigan* v. *Jackson,* 475 U.S. 625, 632, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986), indicates that the sixth amendment right "requires at least as much protection as the Fifth Amendment right" and that the *Edwards* court noted that it has "strongly indicated that additional safeguards are necessary when the accused asks for counsel." *Edwards* v. *Arizona,* 451 U.S. 477, 484, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981). In doing so, he refers to *United States* v. *Mohabir,* 624 F.2d 1140 (2d Cir. 1980), a case that predates both *Jackson* and *Edwards.* We decline the defendant's invitation to follow *Mohabir.*

The circuits have split regarding what warnings are required before a defendant can validly waive his sixth amendment right to counsel. The Second Circuit, as set out in *Mohabir,* takes the strictest approach and is clearly the minority view. In *Mohabir,* it held that a waiver of this right before trial requires "a clear and explicit explanation of the Sixth Amendment rights the defendant is giving up." *Miranda* warnings, alone, are not sufficient. Id., 1146, 1150. In addition, it has not only held that the rights must be explained by a neutral judicial officer and not by the prosecutor or the police agent seeking the waiver, but also that the judicial officer must show the indictment to the defendant, explain its significance and describe the "seriousness of his situation, in the event he should decide to answer questions of any law enforcement officers in the absence of counsel." Id., 1153. The Fifth Circuit has found informed waiver where the defendant has received *Miranda* warnings and has indicated a willingness to talk. See, e.g., *Felder* v. *McCotter,* 765 F.2d 1245, 1250 (5th Cir. 1985). The Third, Sixth, Ninth and Eleventh Circuits appear to have adopted the most lenient approach, holding that *Miranda* warnings alone are enough to find a valid waiver of the sixth amendment right to counsel. See *United States* v. *Cobbs,* 481 F.2d 196, 199 (3d Cir.), cert. denied, 414 U.S. 980, 94 S. Ct. 298, 38 L. Ed. 2d 224 (1973) (decision rendered before *Edwards* and *Brewer*); *United States* v. *Woods,* 613 F.2d 629, 634 (6th Cir.), cert. denied, 446 U.S

Next, we take up the defendant's claim that the record does not show a valid waiver of his fifth amendment right to silence and to counsel. We do not agree.

The inquiry whether the defendant has made a knowing, voluntary and intelligent waiver of his fifth amendment right has two distinct dimensions. *Moran* v. *Burbine,* supra, 421; *Edwards* v. *Arizona,* supra, 482; *Brewer* v. *Williams,* supra, 387. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare* v. *Michael C.,* [442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)]. See also *North Carolina* v. *Butler,* [441 U.S. 369, 374–75, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979)]." *Moran* v. *Burbine,* supra, 421; *State* v. *Shifflett,* supra, 731.

"Settled principles of law control the role of police during custodial interrogations. See, e.g., *Moran* v. *Burbine,* [supra]; *Smith* v. *Illinois,* 469 U.S. 91, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984); *Edwards* v. *Ari-*

920, 100 S. Ct. 1856, 64 L. Ed. 2d 275 (1980) (decision rendered before *Edwards*); *United States* v. *Karr,* 742 F.2d 493, 496 (9th Cir. 1984); *Tinsley* v. *Purvis,* 731 F.2d 791, 793–94 (11th Cir. 1984). The Seventh Circuit apparently takes a case-by-case approach. *Robinson* v. *Percy,* 738 F.2d 214, 222 (7th Cir. 1984). Other circuits take an intermediate approach. See *United States* v. *Payton,* 615 F.2d 922, 924–25 (1st Cir.), cert. denied, 446 U.S. 969, 100 S. Ct. 2950, 64 L. Ed. 2d 830 (1980) (decision rendered before *Edwards*); *United States* v. *Clements,* 713 F.2d 1030, 1036 (4th Cir. 1983) (waiver requires knowledge of indictment), vacated by an equally divided court, 728 F.2d 654 (4th Cir. 1984) (en banc); *Fields* v. *Wyrick,* 706 F.2d 879, 881–82 (8th Cir. 1983).

*zona,* [supra]; *Rhode Island* v. *Innis,* [supra]; *North Carolina* v. *Butler,* [supra]; *Miranda* v. *Arizona,* [supra]; *State* v. *Smith,* 200 Conn. 465, 512 A.2d 189 (1986); *State* v. *Derrico,* 181 Conn. 151, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). If a suspect indicates that he wishes to remain silent, 'the interrogation must cease' and if he requests counsel, 'the interrogation must cease until an attorney is present.' *Miranda* v. *Arizona,* supra, 474; *Edwards* v. *Arizona,* supra, 482. *Miranda* also holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings, 'provided the waiver is made voluntarily, knowingly and intelligently.' *Miranda* v. *Arizona,* supra, 444; see *Johnson* v. *Zerbst,* [supra]. Once a suspect has invoked his right to counsel, he is not subject to further interrogation until counsel has been made available to him 'unless the accused himself initiates further communication, exchanges, or conversations with the police'; *Edwards* v. *Arizona,* supra, 484–85; *and* he has knowingly and intelligently waived the right to counsel that he has previously invoked. *Connecticut* v. *Barrett,* 479 U.S. 523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987); *Smith* v. *Illinois,* supra. Waiver of *Miranda* rights must, of course, be voluntary. *Moran* v. *Burbine,* supra, 421." (Emphasis added.) *State* v. *Evans,* supra, 223–24; see *State* v. *Chung,* 202 Conn. 39, 48–50, 519 A.2d 1175 (1987).

Many of the circumstances already discussed with reference to the defendant's sixth amendment claim apply to our determination of his fifth amendment claims. We have described his receipt and awareness of his rights given to him on a number of occasions, his solicitation of the visit from Malcolm, the careful attention of Malcolm in advising him of his rights before proceeding at various stages of the April 28, 1982 interview, his unambiguous requests for Malcolm not to

leave on two occasions, his unmistakable query for specific information from Malcolm and his posture in deciding to invoke his rights when he chose to do so. His informed decision and his free choice to relinquish his fifth amendment rights must stand. There was no intimidation, coercion or deception on the part of Malcolm. There was, despite his claim to the contrary, nothing ambiguous about the defendant's comprehension of his rights or his position. He made no request for counsel that was equivocal and that reasonably called for clarification from Malcolm. See *State* v. *Shifflett,* supra; *State* v. *Wilson,* 199 Conn. 417, 443, 513 A.2d 620 (1986); *State* v. *Acquin,* 187 Conn. 647, 674–75, 448 A.2d 163, cert. denied, 463 U.S. 1224, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). His argument that his refusal to put anything in writing was an expression of his desire to have counsel there that somehow invoked his right to counsel must fail for two reasons. First, the evaluation of the evidence touching this matter which is the fairest to the defendant does not justify any such inference. Second, each time the defendant refused to give a signed statement, coupled as the refusal was with his relating what his lawyer had told him, Malcolm scrupulously treated the interview as over. The defendant, at his own instance, "initiated," in the *Edwards* v. *Arizona* sense, the communication that culminated in his admissible statement of April 28, 1982. See also *State* v. *Evans,* supra. With this sufficient waiver, there was no violation of the defendant's fifth amendment right.

## II

The defendant's second claim is that the introduction of evidence of other crimes committed by the defendant was highly inflammatory and prejudiced the jury. The defendant argues that evidence of these other crimes neither demonstrated a unique pattern nor indicated a striking similarity to the charged offense, and therefore was inadmissible. We disagree.

The state made an offer of proof on two crimes, both of which had resulted in guilty pleas entered by the defendant after his indictment on the felony murder charge at issue in this case.

The first incident introduced into evidence was a burglary committed at a home for the retarded on April 10, 1982. Mohagel, the defendant's accomplice in this burglary, testified at the offer of proof that he and the defendant had gone to the home for the retarded on that evening for the purpose of breaking in and "taking valuables." The pair entered a bedroom occupied by a man and a woman. While Mohagel took items from the room, the defendant was "beating up" the occupants. After taking items from an unoccupied bedroom, they proceeded to a third room where a woman was listening to a stereo through earphones. The defendant pulled the plug on the stereo and put a pillow over the woman's head. After Mohagel removed numerous items from the room, he finally had to pull the defendant "off the lady" who had been struggling with the defendant. The two proceeded to a fourth room, where screaming by the home's occupants forced them to flee the home. The state offered into evidence an exhibit that was a stipulation that on July 6, 1983, the defendant had pleaded guilty to first degree burglary at the home for the retarded.

The state maintained that this incident showed a common design or mode of operation indicating that the defendant would take personal property from vulnerable victims and use "excessive force." The state also emphasized the close proximity in time to the charged offense (eight days). The defendant argued that the probative value of that incident was greatly outweighed by its prejudice to the defendant. The trial court, noting the proximity in time and the similarity of the incidents including the beating up of the victims, determined that the probative value outweighed the prejudicial effect.

The second incident introduced into evidence concerned a robbery at St. Joseph's Cathedral on April 8, 1982. William McGee, aged ninety, testified at the offer of proof that he was praying at 4 p.m. that afternoon in a pew at St. Joseph's in Hartford. Simms, who participated in this robbery with Mohegal and the defendant, attempted to shove McGee under the pew, ripped his pants and removed his wallet. Simms tried to kick McGee but the victim temporarily halted the assault by grabbing Simms' leg. As McGee attempted to escape, the three assailants surrounded him and the defendant struck him in the face, breaking three bones in the jaw and cheek. Malcolm testified that, approximately two weeks after the incident, McGee had identified the defendant from photographs as one of the perpetrators of the robbery. The state also introduced into evidence an exhibit that indicated that on July 6, 1983, the defendant had pleaded guilty under the *Alford* doctrine to the first degree robbery of McGee.

The state argued that the McGee robbery was relevant to issues of "intent or identity or modus operandi" because it occurred at the same location as the present crime, the victim was vulnerable and "excessive or gratuitous violence" was used. The defendant maintained that there is a distinction between a robbery and felony murder, and again asserted that the robbery's prejudicial impact outweighed its probative value. The trial court determined that the evidence was admissible because the robbery was committed within six days of the felony murder at the same location, each crime involved a physical beating, each victim was elderly and, lastly, that its probative value outweighed its prejudical impact.

" 'As a general rule, evidence of guilt of other crimes is inadmissible to prove that a defendant is guilty of the crime charged against him. *State* v. *Harris,* 147 Conn. 589, 599, 164 A.2d 399 [1960].' *State* v. *Freder-*

*icks,* 149 Conn. 121, 124, 176 A.2d 581 (1961)." *State* v. *Braman,* 191 Conn. 670, 675, 469 A.2d 760 (1983); C. McCormick, Evidence (2d Ed. 1972) § 190; 1 F. Wharton, Criminal Evidence (13th Ed.) § 170. The rationale of this rule is to guard against the use of such evidence to show the defendant's bad character or to suggest that the defendant has a propensity for criminal behavior. *State* v. *Morowitz,* 200 Conn. 440, 442, 512 A.2d 175 (1986); *State* v. *Williams,* 190 Conn. 104, 107–108, 459 A.2d 510 (1982). Such evidence, however, may be admissible for other purposes, such as "to prove knowledge, intent, motive, and common scheme or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency." *State* v. *Lizzi,* 199 Conn. 462, 468, 508 A.2d 16 (1986).

The analysis on the issue of other crimes evidence is two-pronged. "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crimes evidence." *State* v. *Braman,* supra, 676. "Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. E.g., *State* v. *Tucker,* [181 Conn. 406, 416, 435 A.2d 986 (1980)]; *State* v. *Turcio,* [178 Conn. 116, 129, 422 A.2d 749 (1979), cert. denied, 444 U.S. 1013, 100 S. Ct. 661, 62 L. Ed. 2d 642 (1980)]; *State* v. *Hauck,* [172 Conn. 140, 144, 374 A.2d 150 (1976)]. On review by this court, therefore, 'every reasonable presumption should be given in favor of the trial court's ruling.' *State* v. *Ryan,* [182 Conn. 335, 337, 438 A.2d 107 (1980)]." *State* v. *Howard,* 187 Conn. 681, 685, 447 A.2d 1167 (1982).

The trial court admitted the evidence of the burglary at the home for the retarded and the robbery of McGee

at St. Joseph's Cathedral because it demonstrated a common scheme or design. When evidence of other crimes is offered to show a common design, "the marks which the [other] and the charged offenses have in common must be such that it may be logically inferred that if the defendant is guilty of one he must be guilty of the other." *State* v. *Esposito,* 192 Conn. 166, 172, 471 A.2d 949 (1984). "It is not enough that the two offenses are similar. To establish a common design, the characteristics of the two offenses must be sufficiently distinctive and unique 'as to be like a signature.' McCormick, Evidence, supra, p. 560." *State* v. *Morowitz,* supra, 443. " 'On the other hand, the inference need not depend upon one or more unique features common [to both offenses], for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together.' . . . *People* v. *Haston,* 69 Cal. 2d 233, 245–46, 444 P.2d 91, 70 Cal. Rptr. 419 (1968)." *State* v. *Esposito,* supra. In order to assess the defendant's claim, we must examine the other crimes evidence and compare it to the charged offense.

The burglary at the home for the retarded occurred in the same general neighborhood as the alleged felony murder and occurred only eight days later. The robbery of McGee took place at the exact location as the charged offense and occurred only six days later. Proximity in time and place are often probative of a common scheme or design. See, e.g., *State* v. *Mandrell,* 199 Conn. 146, 152, 506 A.2d 100 (1986) (liquor store robberies were located near each other, on same street); *State* v. *Crosby,* 196 Conn. 185, 191, 491 A.2d 1092 (1985) (burglaries occurred three weeks apart); *State* v. *Esposito,* supra, 170 (crimes occurred five weeks apart); *State* v. *Howard,* supra, 684 (incidents occurred within five minute walk of each other). In all three inci-

dents the same perpetrators were involved. The defendant was accompanied by both Simms and Mohagel in the charged offense and the robbery at St. Joseph's Cathedral. The defendant and Mohagel were involved in the burglary of the home for the retarded. Participation in various offenses by the same parties can be significant. See, e.g., *State* v. *Ryan,* supra. The victims in all three cases were highly vulnerable: McGee and McInnis were both elderly, and the victims of the burglary were retarded. Although vulnerable persons such as the elderly and retarded are disproportionately victims of crime and this evidence should not by itself rise to a level of a "signature crime," the fact that this trio often preyed on highly vulnerable persons was probative of a common scheme or design. See, e.g., *State* v. *Esposito,* supra, 170; *State* v. *Falby,* 187 Conn. 6, 24, 444 A.2d 213 (1982) (attacks on young girls).

The most significant similarity of the other crimes evidence is the excessive and unnecessary violence perpetrated by the defendant in all three incidents. The testimony revealed that in the burglary of the home for the retarded, the defendant had to be "pulled off" a retarded woman whom he was beating, that in the robbery, the defendant broke three bones in the victim's face, and that in the alleged felony murder, the defendant stomped, punched and kicked the victim. In all three cases, the violence was unnecessary to the underlying larceny. All the force necessary to accomplish the taking of the personal property was utilized before the defendant used excessive violence in all three cases: Mohagel had completed his larceny in the room before he had to pull the defendant off the woman; Simms had taken McGee's wallet when the defendant struck McGee; the key ring, watch and ring had already been taken from McInnis when the defendant repeatedly struck him. We agree with the trial court that the amount of force and the timing of the violence were

probative of a common scheme and identity in this case. See, e.g., *State* v. *Mandrell,* supra (defendant displayed violent and aggressive behavior); *Cook* v. *State,* 158 Ga. App. 389, 280 S.E.2d 409 (1981) (nightclub security officer similarly attacked and inflicted serious head wounds on patrons).

Taking the circumstances of the "other crimes" evidence as a whole and comparing them to the charged offense justifies the inference that the individual who committed the first two offenses also committed the second. *State* v. *Esposito,* supra, 171. We conclude that the trial court correctly held that the circumstances of the other crimes were sufficiently similar to the charged offense to be probative of identity or a common scheme.

Having determined that the evidence of other crimes was relevant and material, we must now review the trial court's determination that the probative value of the evidence outweighed its prejudicial effect. *State* v. *Morowitz,* supra, 445–46; *State* v. *Shindell,* 195 Conn, 128, 136, 486 A.2d 637 (1985). The trial court, while noting that the similarity of the incident at the home for the retarded made the evidence probative, also recognized that there was "a prejudicial effect." The trial court, however, specifically found that the probative value of the evidence outweighed this prejudice. It made a similar finding for the robbery of McGee. Thus, it is apparent that the trial court realized the potential prejudice to the defendant but made a careful determination that it was outweighed by the significant probative value of the evidence.

In addition, the trial court lessened the potential prejudice to the defendant by giving a number of limiting instructions. The first was given following Mohagel's testimony concerning the incident at the home for the retarded. The second limiting instruction was given following the presentation of evidence concerning the rob-

bery of McGee. Another instruction on both incidents was included in the final charge to the jury. This court has recognized the significance of limiting instructions in order to minimize the potential prejudice in cases where evidence of other crimes is admitted. See, e.g., *State* v. *Brown,* 199 Conn. 47, 58, 505 A.2d 1225 (1986); *State* v. *Hauck,* supra, 147; see also *State* v. *Rodriguez,* 10 Conn. App. 176, 180, 522 A.2d 299 (1987). The trial court's instructions also emphasized that the jury independently assess the similarity between the various offenses and that if it found that the crimes were not similar, it should not credit this evidence at all. Thus, the instructions focused the jury's attention on the precise factors that the trial court had considered when it made its threshold finding of admissibility. The jury was free to attach as much weight to the evidence of other crimes as it thought the evidence merited. In view of the "inherently imprecise nature of the balancing process"; *State* v. *Morowitz,* supra, 447; and the numerous limiting instructions given to the jury, we conclude that the trial court did not abuse its discretion in finding that the probative value of the evidence outweighed its prejudicial impact.

## III

The defendant's next claim is that the trial court erred in permitting the state, on its redirect examination of Mohagel, to introduce evidence of prior crimes committed by the defendant at the cathedral. The trial court concluded that defense counsel had "opened the door" during the cross-examination of Mohagel by asking questions that implied that Simms and Mohagel but not the defendant had previously committed crimes at the cathedral. We agree with the trial court's ruling.

Mohagel testified on direct examination that he and Simms had attempted to discourage the defendant from stopping at the cathedral on the night of the homicide.

Mohagel explained that, having robbed there before, they knew there was no money to be made. On cross-examination, the defendant asked Mohagel if he knew there was no money to be made at the cathedral because he previously had robbed people there. In testimony both previous and subsequent to this passage, the defendant asked Mohagel numerous questions that implied that he and Simms were participants in numerous criminal activities but that the defendant was not. Following the cross-examination of Mohagel, the state asked the trial court's permission to ask questions on redirect concerning the defendant's involvement in those incidents referred to by Mohagel. The trial court agreed with the state, holding that "[a]ll these little questions lead up to one tendency. Through your cross-examination, there's been a definite tendency to indicate that the participation in the various activities was with Simms and the witness, excluding the defendant. So, there's no question in the Court's mind that that has opened up the door as to whether or not Mr. Jones was ever with them on any of these occasions."

The state proceeded to elicit testimony from Mohagel that the defendant had committed "[a]bout three" other robberies at the cathedral with Mohagel. Mohagel testified that he and the defendant had robbed two men who were praying, that Mohagel was a lookout while the defendant had stolen a woman's pocketbook and that the defendant had robbed money from a man whom he shoved into a closet while Mohagel was stealing a woman's purse. Mohagel also testified that in addition to participating in these three robberies, he and the defendant had stolen money from the poor boxes at the cathedral. The trial court, during the trial, instructed the jury that this redirect testimony by Mohagel was offered only for the purpose of correcting the inference that Simms and Mohagel, but not the defendant, had considerable prior experience commit-

ting crimes at the cathedral. In its final charge to the jury, the trial court repeated the limiting instruction, reminding the jury that this evidence was admitted to rebut the suggestion that the defendant had not participated in other crimes at the cathedral and had no knowledge of them.

"The basic purpose of redirect examination is to enable a witness to explain and clarify relevant matters in his testimony which have been weakened or obscured by his cross-examination. *State* v. *Reed,* 174 Conn. 287, 301, 386 A.2d 243 (1978)." *State* v. *Graham,* 186 Conn. 437, 448, 441 A.2d 857 (1982); C. McCormick, Evidence (3d Ed. 1984) § 32, pp. 69–71. The scope of redirect examination, however, is limited by the subject matter of cross-examination. C. McCormick, supra, §§ 32, 57; C. Tait & J. LaPlante, Connecticut Evidence (1976) § 3.3. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. *State* v. *Roy,* 173 Conn. 35, 50, 376 A.2d 391 (1977)." *State* v. *Graham,* 200 Conn. 9, 13, 509 A.2d 493 (1986). The litigant who initially elicits testimony on a certain issue is said to have "opened the door" to rebuttal by the opposing party. Although the doctrine of opening the door cannot be "subverted into a rule for injection of prejudice"; *United States* v. *Lum,* 466 F. Sup. 328, 334–35 (D. Del. 1979), quoting *United States* v. *Winston,* 447 F.2d 1236, 1240–41 (D.C. Cir. 1971); such testimony may be allowed "where the party initiating inquiry has made unfair use of the evidence." *State* v. *Graham,* 200 Conn. 9, 13, 509 A.2d 493 (1986). The trial court should permit it " ' "only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence." *California Ins. Co.* v. *Allen,* 235 F.2d 178, 180 (5th Cir. 1956).' *United States* v. *Winston,* supra." Id., 14. The trial court, however, has broad discre-

tion to rule on the relevancy of evidence and its decision will not be reversed unless it has abused that discretion. *State* v. *Nims,* 180 Conn. 589, 599, 430 A.2d 1306 (1980); *State* v. *Roy,* supra, 50.

In this case, the defendant pursued an extensive line of questioning suggesting that Mohagel and Simms knew that there was no money at the cathedral because they had committed numerous crimes there. It raised the inference that the defendant was told this by Mohagel because the defendant had not participated in those crimes. The testimony suggested that Simms and Mohagel were the main perpetrators of crimes in the cathedral area and that perhaps the defendant was not involved in any of those crimes. It was permissible to rebut these inferences with testimony that demonstrated that the defendant knew all about the prospects for crime at the cathedral because he had also participated extensively in such activities. Although evidence of these other crimes may not have been admissible under a different theory, once the defendant raised that inference to the jury, the redirect examination permitted by the trial court was not an abuse of its discretion.

## IV

Finally, the defendant claims that his sixth amendment right to confrontation was violated when the trial court prohibited the impeachment of Mohagel by the use of a felony underlying Mohagel's youthful offender status. We do not agree.

At the trial, the state made a motion in limine asking for a ruling that the defendant be unable to use, for impeachment purposes, the earlier felony committed by Mohagel for which he had been adjudicated a youthful offender. See General Statutes § 54-76b et seq. The state freely admitted that, but for Mohagel's youthful offender determination, the underlying crime would have been a felony had Mohagel been convicted

of it as an adult. The state refused to disclose the nature of the underlying felony. The defendant, in opposing the state's motion, argued that to do so would deny him his constitutional right to confrontation and he cited *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), to support his claim. The trial court ruled against the defendant, pointing out that youthful offender "treatment" is not a "crime" or "a criminal conviction" in Connecticut. In doing so, it also rejected the defendant's claim that he should be able to impeach Mohagel with the underlying felony on the ground that he was entitled to cross-examine on it as "a prior act of misconduct."

In this court, the defendant, citing *Davis* v. *Alaska,* supra, maintains that the trial court abused its discretion by finding Mohagel's youthful offender status *"absolutely* inadmissible" for impeachment purposes without weighing the defendant's constitutional right of confrontation and that, in so doing, the court imposed a per se rule of exclusion. The state, therefore, he contends, has the burden of proving that this violation is harmless beyond a reasonable doubt. The state, on the other hand, argues that there was no denial of the defendant's sixth amendment right and that the record discloses exhaustive impeachment inquiries during an extensive cross-examination of Mohagel by the defendant. It also disputes the reliance on *Davis* v. *Alaska,* supra, arguing that here the defendant is contending that the conduct underlying the youthful offender status was perhaps admissible as general impeachment evidence and not to expose bias, interest or motive that was explored at great length at the trial. In any event, the state asserts, if there was error in the ruling, it was harmless beyond a reasonable doubt. We agree with the state.[12]

---

[12] At oral argument before us, counsel for the state indicated that the state had recently become aware of "some confusion" in the youthful offender status of Mohagel, stating that there was an indication that

" 'The main and essential purpose of confrontation [under the sixth amendment] is *to secure for the opponent the opportunity of cross-examination. . . .*' " (Emphasis in original.) *Davis* v. *Alaska,* supra, 315–16, quoting 5 J. Wigmore, Evidence (3d Ed. 1940) § 1395, p. 123; see *Pointer* v. *Texas,* 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). The defendant's right to confrontation is preserved, if, through cross-examination, defense counsel is "permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis* v. *Alaska,* supra, 318; see *Delaware* v. *Van Arsdall,* 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State* v. *Weidenhof,* 205 Conn. 262, 270, 533 A.2d 545

---

Mohagel's application for youthful offender treatment may not have been granted. Stating that the record does not clearly show one way or the other, counsel for the state said that she was not in a position to say whether Mohagel did or did not, in fact, have a youthful offender "conviction." Counsel for the state also said that, at the time of the defendant's trial, the state believed that Mohagel had been accorded youthful offender status. Our examination of the trial transcript reveals that the state's attorney believed that youthful offender status was granted as he urged the trial court to grant his motion in limine to proscribe defense counsel from inquiring into Mohagel's youthful offender status, including the underlying felony involved. While the defendant excepted to the trial court's ruling, no record was sought to be made at trial of any documents relevant to that issue, and so we have nothing before us in that regard. No explanation for this exists in the record, the briefs or the exhibits. We have taken the position in cases of this general nature that "[w]e must decide the issue present on the record [we have]." See *State* v. *Moye,* 177 Conn. 487, 495, 418 A.2d 870 (1979); *State* v. *Heyward,* 152 Conn. 426, 429, 207 A.2d 730 (1965). Under all the circumstances, including the disclosure by the record of the sweeping exposure to the jury of the believability of Mohagel as he testified, especially on cross-examination, we have decided to review this claim on the record we have. In doing so, we are persuaded that no injustice is being done the defendant who fully and at length was given the opportunity, which he skillfully employed, to attack Mohagel's credibility.

There is no question that the issue of whether the right of confrontation in a criminal case includes the right to inquire of a witness concerning his earlier adjudication as a youthful offender, including the underlying crime, is an important issue. This record, however, is not adequate for us to have to decide that issue in this case.

(1987). "The defendant's right to cross-examination . . . is not absolute and is subject to reasonable limitation by the court." *State* v. *Thompson,* 191 Conn. 146, 148, 463 A.2d 611 (1983). "Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error." *State* v. *Vitale,* 197 Conn. 396, 403, 497 A.2d 956 (1985). Only last year, the United States Supreme Court specifically reiterated that " 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to what extent the defense might wish.' *Delaware* v. *Fensterer,* 474 U.S. 15, 20 [106 S. Ct. 292, 88 L. Ed. 2d 15 (1985)] (per curiam) (emphasis in original)." *Delaware* v. *Van Arsdall,* supra, 679. " 'The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge . . . but this discretion comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment.' " (Citations omitted.) *State* v. *Castro,* 196 Conn. 421, 424, 493 A.2d 223 (1985); *State* v. *Gaynor,* 182 Conn. 501, 508, 438 A.2d 749 (1980). This involves a two-step analysis, determining first whether the cross-examination of Mohagel that was permitted to defense counsel comported with sixth amendment standards; see *Davis* v. *Alaska,* supra; and second, whether the trial court abused its discretion in refusing to permit the defendant to cross-examine on Mohagel's youthful offender determination and, specifically, the underlying felony conduct. See *State* v. *Castro,* supra, 424–25; *State* v. *Gaynor,* supra, 510.

In the circumstances of this case, we conclude that the trial court did not abuse its discretion in the challenged ruling. The record discloses that the required constitutional standard was abundantly satisfied in this case: the defendant was given sufficient opportunity to cross-examine Mohagel and to expose his credibil-

ity to the jury, and defense counsel ably availed himself of that opportunity to show bias, interest, motivation and the like. For example, the jury knew that Mohagel himself had been indicted for this felony murder, that he was testifying for the state because of a plea bargain under which the state had promised to reduce the charge to conspiracy to commit robbery in the first degree and that the state had agreed to recommend a ten year prison sentence. In this connection, Mohagel admitted that there were three other crimes for which the state was not going to prosecute him, as well as a number of "other ones." The jury also knew that he would not be charged with any further crimes relating to his testimony. The jury was told that although Mohagel had been indicted for the felony murder in June, 1982, he never gave the police any statement concerning this crime until October, 1983, after he had learned that Simms had been convicted of the same crime. Mohagel did not testify at Simms' trial. Mohagel said that prior to Simms' trial he had talked to Simms in jail and that Mohagel had agreed that he would not talk to anybody about the case, but that he had changed his mind after Simms was convicted and he then realized that he, too, had some "exposure." Mohagel's testimony also included many admissions of prior misconduct, a number of which put his veracity into sharp focus. For example, on April 10, 1982, he and the defendant had broken into a home for the retarded on Marshall Street in Hartford and he had stolen such things as a television, a stereo and a jewelry box. He admitted his involvement in other robberies in St. Joseph's Cathedral. He had also stolen money from the poor boxes in that cathedral. Mohagel also said that he had stolen a ten-speed bicycle from "a college" a few weeks before the McInnis murder. In addition, he had stolen a gun from a car and kept it with him in the half-way house in which he resided at the time of the cathedral murder.

There were other admissions of Mohagel during his testimony that demonstrated other misconduct. He admitted that on the night of the McInnis homicide, he had originally intended, after planning it with Simms, to break into the Old Stage Company in downtown Hartford to steal some radios. He told the jury that, during the burglary of the home for the retarded, he had threatened some of the residents with a sword he owned. Mohagel also said that he had threatened "people on the street" with his gun. Defense counsel also questioned Mohagel on certain claimed prior inconsistent statements.

*Davis* held that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis* v. *Alaska,* supra, 316; see *State* v. *Brigandi,* 186 Conn. 521, 533, 442 A.2d 927 (1982). "Cross-examination regarding motive, bias, interest and prejudice is a matter of right and may not be unduly restricted." *State* v. *Milum,* 197 Conn. 602, 609, 500 A.2d 555 (1985); see *State* v. *Lubesky,* 195 Conn. 475, 482, 488 A.2d 1239 (1985); *State* v. *Luzzi,* 147 Conn. 40, 46, 156 A.2d 505 (1959). There are times when the denial or undue restriction of the right of confrontation can constitute constitutional error. *Davis* v. *Alaska,* supra, 318; *State* v. *Ouellette,* 190 Conn. 84, 101, 459 A.2d 1005 (1983).

The challenged ruling clearly is not any basis in this case for claiming the denial of the constitutional right of confrontation with its primary weapon of cross-examination. The far-ranging disclosure of Mohagel's motive in testifying and his interest, bias and prejudice were laid bare for the jury to assess. The right of cross-examination was constitutionally accorded and skillfully exercised. We find no abuse of discretion in the trial court's ruling as it did.

There is no error.

In this opinion the other justices concurred.