## STATE OF CONNECTICUT *v.* MICHAEL CURLEY
### (8874)

SPALLONE, FOTI and LAVERY, Js.

Argued December 12, 1990—decision released July 23, 1991

*Andrew B. Bowman,* for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *C. Robert Satti, Jr.,* assistant state's attorney, for the appellee (state).

SPALLONE, J. The defendant was convicted, after a jury trial, of intentionally aiding another in the sale of cocaine, in violation of General Statutes §§ 53a-8 and 21a-278 (b), and conspiracy to sell cocaine in violation of General Statutes §§ 53a-48 (a) and 21a-277. On appeal, the defendant claims that the trial court improperly (1) denied his motion to suppress his postarraignment statements thereby violating his right to counsel under the sixth and fourteenth amendments, (2) instructed the jury on consciousness of guilt, (3) allowed the prosecution to refer to "organized crime" and to inject evidence of an armed robbery involving a state's witness, and (4) denied his motion for a new trial in which he alleged that a critical and exculpatory witness was kept from testifying from fear that the prosecution would withdraw a favorable plea agreement. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On November 17, 1988, officers of the statewide narcotics task force undertook an undercover operation. Among the participants were Sergeant John Petrowski, Trooper John Ramik, and Trooper Donald Kinahan of the state police, and Officer Karla Massina of the Westport police department. Petrowski served as a cover officer and ran the recording equipment. Massina was equipped with hidden audio devices and, with Kinahan, attempted to purchase drugs. Ramik staked out a building in Bridgeport where a drug operation was believed to be controlled.

When the officers arrived in Bridgeport, Massina called a pager number from a pay phone. Shortly there-

after a party called back whom Massina identified as Louis Rodriquez. Massina told Rodriquez that she wanted to buy one-half ounce of cocaine. Rodriquez told her to wait where she was and "his boy" would bring the drugs to her. Soon after Massina had talked to Rodriquez, Ramik observed four males leave 2992 Main Street in Bridgeport, get into a white Buick Century and head in the direction from which Massina had made her call. Ten to fifteen minutes after Massina's call a white Buick Century containing four males drove slowly past the undercover officers.

The driver, whom Massina and Kinahan identified in court as the defendant, Michael Curley, then made a U-turn, drove back and told the officers to follow him. The officers proceeded in their own vehicle and followed the Buick to a side street. Massina and Kinahan exited their vehicle, and Massina approached the defendant and Rodriquez who were standing next to the Buick. Rodriquez introduced the defendant as Michael. He then put his arm around Massina, she handed Rodriquez the money, and he gave her the cocaine. As Rodriquez counted the money, the defendant told Massina that he had come along to check things out and to be sure that she was not a cop or that she had not been followed by cops. The sale was completed and the parties returned to their vehicles. On November 22, 1988, the defendant was arrested. The defendant was initially charged with conspiracy to commit a robbery in addition to the other charges. Although the trial court eventually refused to submit this charge to the jury, a portion of the trial concerned the facts surrounding this allegation. A review of some of these facts is relevant to our discussion of the defendant's claims on appeal.

Officer Brian McElligott of the Stamford police department testified that on November 18, 1988, while working as an undercover agent, he went to the Auto

Connection, a business owned by the defendant, and was introduced to him. He also testified that during the course of a brief conversation, the defendant indicated that he could supply McElligott with cocaine, and that McElligott should come back later in the day. McElligott testified that he returned two hours later but was rebuffed by Harry Riccio who was highly agitated and told him that "Mike's [the defendant] busy now; he can't talk to you. There's no drugs around here. Go back to your friends if you want drugs." Thereupon, because Riccio was adamant, McElligott left the premises at approximately 5 p.m.

McElligott further testified that he telephoned the defendant on Monday, November 21, 1988, just before 5 p.m. and asked him, if he could "do something." The defendant responded by advising McElligott to come down. McElligott returned to the Auto Connection with Ramik. The officers parked on the street. The defendant came over to them and they asked him if he could do something. The defendant replied: "My friend Bill, he's my boy, he'll take care of it for you." Francisco Cotto was standing two to three feet away and, after the defendant went back inside, McElligott drove down the street to talk to Cotto about buying cocaine. McElligott was advised by Cotto that the price was $800 an ounce and that he should return later alone. At 7 p.m. the same evening, McElligott returned and met Cotto. They were both alone. Cotto told McElligott to leave his vehicle and to get into Cotto's car. McElligott stated that during the ride Cotto took a gun from underneath his leg and pointed it at McElligott's left ear. In response to Cotto's order, McElligott placed $800 on the floor, exited the vehicle and backed away with his hands raised. After a chase through the streets of Bridgeport and Stamford, Cotto was apprehended and the loaded gun was seized.

The defendant made four separate statements to the police regarding these incidents. The first statement was given immediately after his arrest on November 22, in response to a question as to the whereabouts of Rodriquez. At the suppression hearing, the defendant withdrew his objection to this statement. The second statement was made at the Westport police barracks. The defendant conceded that this statement was given after he was properly advised of his *Miranda* warnings and had signed an advisement of rights form. In this interview, the defendant told State Trooper John O'Leary that he did not know why he had been arrested and, upon being told that it was for the robbery of McElligott, he responded that he had thought McElligott was a cop and that he had introduced him to Cotto just to get rid of him.

The third statement, which raises an issue on appeal, was given in the context of the following facts. After the defendant's arraignment and at the police station, O'Leary, whom the defendant had known for over twenty-five years, gave the defendant a telephone number and told the defendant that he could call to talk to O'Leary anytime he wanted. After posting bond, the defendant went home and discussed the occurrences of the past few days with his family. At some point thereafter, he called O'Leary.

O'Leary testified that he received a telephone call from the defendant who stated that he wanted to speak to him. They agreed to meet at the Trumbull Shopping Park and talk in O'Leary's car. At the shopping park, the defendant told O'Leary that he wanted to talk about the robbery. He explained that he had nothing to do with the robbery of McElligott and that he had only introduced McElligott to Cotto in order to get rid of him. He further related that he was present at a meeting in his office where Cotto said he was planning to rob McElligott. The defendant said that he told Cotto

to leave McElligott alone because McElligott was a cop and that he then left the meeting. He also told O'Leary that Rodriquez was a drug dealer, handling one and one-half kilograms of cocaine a week.

The final statement was made at the Westport police barracks on December 2, 1988. The defendant was with his attorney at this interview. O'Leary testified that the only difference between the conversation at the Trumbull Shopping Park and this fourth statement was that the defendant named an additional person as having been present when Cotto announced his intention to rob McElligott.

I

The defendant's first claim is that his right to counsel under the sixth amendment to the United States constitution as applied to the states through the fourteenth amendment was violated when he gave his third statement to O'Leary after the initiation of adversary judicial criminal proceedings and in the absence of his attorney.

The sixth amendment to the United States constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." A defendant's right to counsel under the sixth amendment arises "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby* v. *Illinois,* 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972); *State* v. *Falcon,* 196 Conn. 557, 560, 494 A.2d 1190 (1985). In this case, the defendant's right to counsel under the sixth amendment attached at his arraignment on November 22, 1988. From that point in time, the defendant was entitled to the presence of counsel at "critical stages" of the proceedings against him, including interrogation.

*Brewer* v. *Williams,* 430 U.S. 387, 401, 97 S. Ct. 1232, 51 L. Ed. 2d 424; *State* v. *Falcon,* supra, 561. The attachment of this right also prohibited the state from "initiating interrogation or intentionally creating a situation likely to induce the defendant to make incriminating statements without the assistance of his counsel. *Michigan* v. *Jackson,* 475 U.S. 625, 635, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986); see *Henry* v. *United States,* 447 U.S. 264, 275, 100 S. Ct. 2183, 65 L. Ed. 2d 115 (1980)." *State* v. *Jones,* 205 Conn. 638, 648, 534 A.2d 1199 (1987).

Although the fifth amendment to the United States constitution is not directly in issue on appeal, it also guarantees a criminal suspect subject to custodial interrogation a right to counsel. See *Miranda* v. *Arizona,* 384 U.S. 436, 469–70, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The fifth amendment protection against self-incrimination requires the police to notify a suspect of the right to counsel and to cease interrogation once the suspect invokes the right. Id., 471–74. Absent counsel, further interrogation may not occur unless the accused initiates the subsequent conversation. *Edwards* v. *Arizona,* 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). If the police initiate subsequent interrogation without having made counsel available to the accused, there can be no valid waiver even though the accused is advised of his constitutional rights and acquiesces in the questioning. Id., 484.

In *Michigan* v. *Jackson,* supra, 636, the Supreme Court extended this fifth amendment protection provided by *Edwards* to postarraignment sixth amendment claims holding that "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." In *Minnick* v. *Mississippi,* 498 U.S.      , 111 S. Ct. 486, 112 L. Ed. 2d

489 (1990), the United States Supreme Court reversed the Mississippi Supreme Court which had held that the *Edwards* protection ceases once the suspect has consulted with an attorney. The Mississippi holding relied on language in *Edwards* indicating that the bar on interrogating the accused after a request for counsel applies " ' "until counsel has been made available to him" ' "; *Minnick* v. *State,* 551 So. 2d 77, 83 (Miss. 1988), quoting *Edwards* v. *Arizona,* supra; and it concluded that, because counsel was made available to Minnick, his fifth amendment right to counsel was satisfied. The Mississippi court's ruling had the curious result of allowing the police to initiate further interrogation of an accused after he had consulted with his attorney. Admittedly, the language in *Edwards,* "until counsel has been made available to him" is somewhat ambiguous and may be viewed as permitting police initiated interrogation after the accused has consulted with counsel. *Minnick* eliminated such ambiguity, however, when it expressly held, that "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." *Minnick* v. *Mississippi,* supra. The Supreme Court went on to say that "*Edwards* does not foreclose finding a waiver of Fifth Amendment protections after counsel has been requested, provided the accused has initiated the conversation or discussion with the authorities . . . ." Id.

The resolution of the defendant's claim thus depends on whether the defendant "initiated" the questioned communication when he called O'Leary and asked to speak with him, or whether the state deliberately "initiated" the communication when O'Leary gave the defendant his telephone number and informed the defendant that he could call him anytime. The evidence elicited at the hearing on the defendant's motion to sup-

press the statements fully supports the conclusion, implicit in the court's denial of the motion, that the postarraignment interview with the police was initiated by the defendant. Of his own volition the defendant initiated the conversation by telephoning O'Leary from his home some time after his release from custody and in the company of his family. The defendant voluntarily left his home and met O'Leary at a neutral location. He told O'Leary that he wanted to talk and then gave a statement. The defendant was an adult and understood the *Miranda* warnings given him earlier at the police station. Accordingly, the statement arising from that interview was properly admitted by the trial court.

## II

The defendant next claims that the trial court improperly instructed the jury that a consciousness of guilt could be inferred if it found that the defendant's trial testimony, which conflicted with that of O'Leary, was false. The defendant did not take exception to this charge and is seeking review under *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973). The guidelines governing such review were recently enunciated in *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989), where the court held that an unpreserved claim of an alleged constitutional violation will not be reviewed on the merits if such violation is subject to harmless error analysis and would be harmless beyond a reasonable doubt. " '[H]armless error' in this context focuses, not on whether the charge was misleading to the jury, but on whether, notwithstanding the misleading nature of the charge, the evidence on the issue was so strong that the reviewing court concludes beyond a reasonable doubt . . . that the error did not contribute to the guilty verdict." (Citations omitted.) *State* v. *Perez,* 10 Conn. App. 279, 285, 523 A.2d 508, cert. denied, 203 Conn. 810, 525 A.2d 524 (1987).

Here, Massina testified that, on the night of the buy, the defendant was driving a car, told them to follow him, exited the vehicle, stood two to three feet from her during the sale and stated that he was there to check things out and to make sure that she was not a cop. McElligott testified that the defendant indicated on at least three occasions, either by phone or in person, that he could supply McElligott with drugs. The defendant told O'Leary that he knew Rodriquez was a drug dealer, where he could be found and the names of his suppliers. On the basis of this evidence, we conclude that the trial court's instruction on consciousness of guilt, even if erroneous, was harmless beyond a reasonable doubt and did not contribute to the verdict. See id., 290.

### III

The defendant also claims that the prosecution's deliberate injection of references to "organized crime" and to evidence pertaining to the armed robbery of McElligott by Cotto prejudiced the defendant and denied him a fair trial.

During the trial, McElligott explained why he backed off from a smaller, older man. "Well he was highly agitated and yelling and I know he's an organized crime figure, he's involved in drugs and potential for buying . . . ." The defendant objected and during argument on the objection the prosecution stated that the reason for asking the question was to explain why McElligott backed off from an older and smaller person. The court stated: "You are not offering it for the truth of the matters asserted, only to show why he backed off." To which the state responded, "Yes, Your Honor."

The trial court then gave a cautionary instruction to the jurors limiting their consideration of the statement to why McElligott backed off from a confrontation with Riccio and admonished them that they may not con-

sider the statement for the truth of the matters contained therein. There was no further mention of Riccio or of McElligott's belief that he was connected to organized crime.

Our Supreme Court has consistently held that an instruction limiting the jury's consideration to the specific purpose for which it was admitted, as illustrated in this case, is the most important method for reducing the prejudicial impact the evidence may have. See, e.g., *State* v. *Jones,* 205 Conn. 638, 663–64, 534 A.2d 1199 (1987); *State* v. *Brown,* 199 Conn. 47, 56, 505 A.2d 1225 (1986); *State* v. *Howard,* 187 Conn. 681, 688, 447 A.2d 1167 (1982). We hold that the trial court's limiting instructions were an adequate and proper response to the defendant's exception.

In his second evidentiary claim, the defendant faults the trial court for not giving a limiting instruction as to the evidence concerning the robbery of McElligott. The defendant never requested such an instruction, does not cite any relevant legal authority to support his claim and does not refer to any standard by which the court's action should be tested. He briefs an unsupported contention that the trial court erred. The bare assertion of error without citation to legal authority may be considered by us to be no claim at all and need not be reviewed. Accordingly, we decline to review this claim. See, e.g., *State* v. *Hernandez,* 204 Conn. 377, 382, 528 A.2d 794 (1987); *Rodriquez* v. *Mallory Battery Co.,* 188 Conn. 145, 148–49, 448 A.2d 829 (1982); *State* v. *Smith,* 10 Conn. App. 624, 635, 525 A.2d 116, cert. denied, 204 Conn. 809, 528 A.2d 1156 (1987); *State* v. *Knighton,* 7 Conn. App. 223, 226, 508 A.2d 772 (1986).

IV

The defendant in his final claim avers that the prosecution violated his sixth and fourteenth amendment

rights to present a critical and exculpatory defense witness by threatening the witness with the withdrawal of a favorable plea agreement if the witness testified at his trial.

The defendant claims that a plea bargain offer made by the state to Rodriquez caused Rodriquez not to testify for the defendant. He claimed that, although Rodriquez' testimony was exculpatory as to the defendant, he would not testify because of the state's threat to revoke a plea agreement favorable to him. Rodriquez was called by the defendant as a witness and appeared accompanied by his attorney. At the time, Rodriquez was charged with various crimes that were still pending against him. Through his attorney, Rodriquez invoked his fifth amendment right not to answer any questions concerning this incident or his relationship with any of the parties.

Defense counsel then asked Rodriquez if at any time during the prior four months a plea bargain had been offered conditioned on his not testifying for the defendant at his trial. The trial court then asked if there was an offer outstanding at that time that contained such a promise. Rodriquez' attorney told the trial court there was not and that Rodriquez was so informed. Defense counsel and the state entered into a stipulation, which was presented to the jury, that Rodriquez was called as a witness but that he refused to testify on the basis of his fifth amendment right.

After the jury verdict, but prior to sentencing, the defendant filed a timely motion for a new trial pursuant to Practice Book § 902. A memorandum filed in support of the motion contained two letters and an affidavit all dated subsequent to the jury verdict. The trial court ruled that the defendant's motion was actually a petition for a new trial and therefore should have been

brought under Practice Book § 904 and accordingly denied the motion. We agree with the trial court.

Practice Book § 902 provides in part: "Upon motion of the defendant, the judicial authority may grant him a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his asserting *the error,* the judicial authority shall grant the motion: (1) *For an error* by reason of which the defendant is constitutionally entitled to a new trial; or (2) *For any other error* which the defendant can establish was materially injurious to him." (Emphasis added.)

It is clear that a motion for a new trial must be premised upon the trial court having committed error prior to the motion for a new trial. The error claimed to support a *motion* for a new trial must have occurred during the trial. The factual allegations put forward by the defendant in his motion for a new trial were not before the court prior to the verdict. The state and the defendant entered into a stipulation that Rodriquez had refused to waive his fifth amendment right. Rodriquez denied any agreement requiring him not to testify against the defendant in return for a favorable plea bargain. Section 902 contemplates court error of such magnitude as to deprive the defendant of a fair trial and in the use of the term "shall grant the motion" mandates a new trial if such error exists. The trial court was never asked to rule on the factual allegations asserted by the defendant in his postverdict motion for a new trial and therefore could not have committed an error based on the defendant's postverdict § 902 motion.

The trial court correctly concluded that Practice Book § 904, which provides in part: "A request for a new trial on the ground of newly discovered evidence shall be called a petition for a new trial and shall be brought

in accordance with Gen. Stat. § 52-270," was the appropriate vehicle for the defendant to raise his allegations.

The petition for a new trial would put before the court the postverdict allegations of newly discovered evidence, here of prosecutorial misconduct, and allow for a full hearing on the merits of the petition as to whether the newly discovered evidence exists and is in fact new and credible. In contrast, the hearing on a § 902 motion for a new trial is to determine whether the court, in the course of the trial, committed error thus depriving the defendant of a fair trial. Thus, the trial court correctly concluded that the proper vehicle for the defendant to pursue was a petition for a new trial under General Statutes § 52-270.

The judgment is affirmed.

In this opinion FOTI, J., concurred.

LAVERY, J., dissenting. I disagree with the majority's conclusion because the state, in the person of Officer John O'Leary, "intentionally creat[ed] a situation likely to induce the defendant to make incriminating statements without the assistance of counsel. *Michigan* v. *Jackson,* 475 U.S. 625, 635, 106 S. Ct. 1404, 89 L. Ed. 2d 63 (1986) . . . ." *State* v. *Jones,* 205 Conn. 638, 648, 534 A.2d 1199 (1987).

During the suppression hearing, evidence was adduced that it was the police and not the defendant who "initiated" the postarraignment contact for the purpose of gathering additional inculpatory information against the defendant. This initiation took place when Officer John O'Leary, who had been a friend of the defendant for twenty-five years, handed the defendant a telephone number and invited him to call after being released on bond. The sole purpose of this maneuver was to elicit a confession by trading on a twenty-five year friendship between the defendant and O'Leary.

In *Spano* v. *New York,* 360 U.S. 315, 79 S. Ct. 1202, 3 L. Ed. 2d 1265 (1959), the United States Supreme Court found that trading on close past relationships for the purpose of lulling the defendant into making inculpatory statements was a constitutionally violative method of extracting information from criminal defendants.

In general, a determination of whether the police have unlawfully initiated communications with a criminal defendant after his sixth amendment right to counsel has attached presents a factual issue for the trial court. Nevertheless, the constitutional implications of such issues require us to make " 'a scrupulous examination of the record to ascertain whether such a finding is supported by substantial evidence.' " *State* v. *Weidenhof,* 205 Conn. 262, 268, 533 A.2d 545 (1987); *State* v. *Toste,* 198 Conn. 573, 580, 504 A.2d 1036 (1986); cf. *State* v. *Jones,* supra. Our review is, therefore, not limited to the evidence before the trial court during the suppression hearing. We must, instead, review the record in its entirety to determine if there has been a violation of the defendant's constitutional rights. *State* v. *Toste,* supra, 576. In this case, such an examination reveals that the defendant's decision to waive his sixth amendment right to deal with the state through counsel was not voluntary or informed.

In *State* v. *Jones,* supra, 651, our Supreme Court found that a criminal defendant had validly waived his sixth amendment right by initiating communications with the police. In reaching that conclusion, the *Jones* court accorded great weight to the facts that the defendant had waived his *Miranda* rights more than once prior to his arraignment, that he had received special advisement by the arraignment court of his fifth and sixth amendment rights to counsel, and that, immediately prior to the postarraignment questioning, the state's investigator again advised the defendant of his

rights and made scrupulous efforts to ensure that the subsequent waiver of those rights was voluntary and knowing.

By contrast, the case before us does not disclose that the defendant initiated the postarraignment contact. When the defendant contacted O'Leary, he was under the impression that O'Leary could help him and that any comments he made would be off the record. The contact made between the defendant and O'Leary took place in a police cruiser parked at a shopping center with another police officer in attendance. The defendant's *Miranda* warnings were not reiterated and he was not apprised of the nature of the right he was abandoning, nor was he advised of the consequences of his decision to waive that right. Id., 653.

Finally, despite the fact that the defendant reiterated his inculpatory statements during a third interrogation at which his attorney was present, the statements made at that time were no more than a corroboration of information obtained by O'Leary during the earlier unconstitutional interrogation. Our Supreme Court has held that where the prosecution relies on a confession uttered after an earlier involuntary confession, it must first prove, by a preponderence of the evidence, that the second confession was not a direct product of the earlier confession. *State* v. *Schroff,* 206 Conn. 182, 197, 536 A.2d 952 (1988).

Here, virtually all of the information obtained at the later interrogation was merely a corroboration of information obtained during the earlier unconstitutional interrogation by O'Leary. It is, therefore, the direct fruit of that interrogation and is tainted by the unconstitutionality of the first confession. Id.; see also *United States* v. *Bayer,* 331 U.S. 532, 540, 67 S. Ct. 1394, 91 L. Ed. 2d 1654 (1947).

334

I would reverse the judgment and remand the case for a new trial with the two postarraignment statements suppressed.