[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 916 
 On Return to Remand
The appellant, Lavon Guthrie, was convicted after a jury trial of the capital offense of murder of Rayford Howard committed during a robbery in the first degree or an attempt thereof, in violation of § 13A-5-40(a)(2), Code of Alabama 1975. At the sentencing phase of the trial, the jury voted unanimously to recommend that the appellant be sentenced to death. At the sentencing hearing held pursuant to §§ 13A-5-47
to -52, the trial court sentenced the appellant to death by electrocution.
At trial, the state's evidence tended to show the following facts: On February 23, 1988, Staci Thompson's automobile was stolen from "Connie's Quik Stop," a convenience *Page 917 
store, in the Tiftonia area of Chattanooga, Tennessee. The car was a black 1983 Ford Mustang with gold stripes, tinted windows, and the words "The Boss" painted on each side. It was later identified at trial as the car pictured in state's exhibits no. 8 and no. 9. The car did not have a license plate at the time it was stolen.
On February 24, 1988, L.G. Windsor saw Harvey Lee Windsor, his nephew and the codefendant in this case,[1] and another man, whom he did not identify, running from L.G.'s black 1976 Ford Mustang automobile, which was parked in his yard. L.G. had previously obtained the car from Harvey Lee. He spoke briefly on this occasion with Harvey Lee, but did not know the man with Harvey Lee. His nephew and the unidentified man left in a "lightish grey" Mustang automobile, which had a "boss motor" in it. He believed it to be either a 1979, 1981, or 1982 model. The next day, L.G. Windsor noticed that the license plate was missing from his 1976 Mustang. The car had had a plate on it when he had obtained it from Harvey Lee. The number on the plate was "39BY845."
On February 25, the appellant and a man introduced as "Harvey Windsor" visited Bobbie Sue Osborne, the appellant's cousin, between noon and 1:00 p.m. at her residence in Ashville, Alabama. When they arrived, the appellant was drinking Budweiser beer. He asked Bobbie Sue for a pair of gloves, explaining that he needed them to work on the transmission of a car. She did not give him any gloves. The appellant and Windsor arrived and left in a black car that had tinted windows and "The Boss" lettered across each side. At trial, Bobbie Sue identified the car pictured in state's exhibit no. 8 as the car being driven by the appellant and "Harvey Windsor."
About "midday" that same day, February 25, the appellant and "Harvey" visited the residence of Sammie Sue Wilson Osborne in Pell City. They arrived in a black car with the words "The Boss" painted on each side. At trial, Sammie Sue identified the car pictured in state's exhibit no. 9 as the car being driven by the appellant and "Harvey." After arriving at Sammie Sue's, the appellant and "Harvey" made sandwiches, drank Budweiser beer that they had brought with them, and stayed about 30 minutes. At trial, Sammie Sue testified that the appellant appeared to be drunk when he left. Her residence is approximately five miles from Howard's Store, a convenience store, (formerly Clements's Store), the scene of the instant offense.
Shortly after 1:00 p.m. on February 25, Frank Woodward and Sergeant Allen stopped at Howard's Store. They parked within 15 to 20 feet of another car in the parking lot. As Woodward walked around his car, he saw a man walk out of the store. The man was carrying a "sawed off gun," which he subsequently unbreached and reloaded. Woodward watched him get in the passenger side of a dark-colored sports car with tinted windows and observed the car leave the parking lot at a high rate of speed and go toward Interstate Highway 20. (The evidence before us fails to disclose if either Woodward or Allen went into the store.) A spent shotgun shell was later recovered in the parking lot of Howard's Store.
Around 2:00 p.m. on February 25, Richard Champion stopped at Howard's Store for gasoline. He put gas in his car and went inside to pay. He did not see the owner, Rayford Howard, but he noticed blood on the counter. After calling out Howard's name, he eased around the counter and saw Howard slumped on the floor. Champion called the police and an ambulance. It was subsequently determined that Howard had been killed by a sawed-off shotgun blast to the chest at close range. The cash register was closed, but the victim's pockets had been turned inside out. *Page 918 
That same afternoon, Jerry Bishop was traveling north on U.S. Highway 431 near Boaz. He pulled into the left lane to pass a car ahead of him when a car suddenly appeared behind him. Bishop moved back into the right lane and was then passed by a black Mustang with gold stripes, tinted windows, and lettering reading, he believed, "Boss Man." He saw two occupants in the Mustang. At trial, he identified the car as the one pictured in state's exhibits no. 8 and no. 9. Bishop watched as the Mustang collided with a car that was trying to turn in front of it. The Mustang did not stop. Bishop caught up with the Mustang in Albertville and noted that the license plate number was "39BY845," the number of the plate that had been removed from L.G. Windsor's car. Bishop reported the incident to the Albertville police.
Later that afternoon, Robert L. Hester, a salesman, was traveling along his route from Cullman to Moulton. He was passed by a black car with racing stripes and tinted windows. At trial, he identified the car as the one pictured in state's exhibit no. 9. He observed that the car had two occupants, that the license plate number was "39BY845," and that the car swerved and "drove all over the road." He watched the car until it pulled off at Tommy's Grocery Store on Alabama Highway 33 south of Moulton. Later, he reported his observations to the State Department of Public Safety.
Tommy Kerr operated Tommy's Grocery Store, a small grocery store and gasoline station, on Highway 33 between Wren and Moulton. Around 5:30 p.m. on February 25, he was unloading drinks inside the store. There were about five people in the store. Someone pulled to the gas pumps up in a black Ford Mustang with tinted windows and pumped some gas. At trial, he identified the car as the one pictured in state's exhibits no. 8 and no. 9. The car then pulled off to the side of the building and remained there for about five minutes. The occupants of the car placed two Budweiser beer cans on the ground outside the car and drove off in a hurry. A subsequent investigation disclosed that one of the appellant's fingerprints was found on one of these beer cans.
Around 8:00 p.m. on the night of February 25, Michael Maxwell went to the Chisca Texaco service station near Cherokee in Colbert County. When he arrived, an early 1980's model, black "Boss" Mustang was parked outside. At trial, he identified the car as the one pictured in state's exhibit no. 8. When he went inside, he saw two men: the owner, Randall Pepper, and a man he later identified in a pretrial photographic array and in court as the appellant. Outside, he saw another man who was sitting half-inside the Mustang, eating an ice cream cone. Maxwell saw no other vehicles around. Before he left the scene, Maxwell noticed that the car's license plate number included the letters "BY."
At 8:00 p.m., Tommy Pepper, Randall Pepper's son, was nearby at their house with his mother, Jane Renee Pepper, when they heard a "shotgun blast" or gunshot. Tommy ran to the station and saw one man sitting in a black sports car with racing stripes and tinted windows and another man running from the store. At trial, he identified the car as the one pictured in state's exhibits no. 8 and no. 9. He later identified one of the men as Harvey Lee Windsor. Jane Pepper, who had also come to the station, saw two men running from the store. She also saw what she described as a 1983 model, dark grey sports car with two stripes on it. At trial, she identified the car as the one pictured in state's exhibits no. 8 and no. 9. Although she could not identify either the appellant or his codefendant at trial as the men she had seen leaving the store, she described one as wearing blue jeans and a cap and having long dark hair. Upon entering the store, the Peppers discovered that Randall Pepper had been shot in the head and killed. His wallet, his .25 caliber automatic pistol, and some cash were missing. The cash register contained only change, no currency.[2] *Page 919 
On the following day, February 26, the black 1983 Ford "Boss" Mustang was recovered at the Tiftonia Baptist Church in Chattanooga, some 600 to 1000 feet from Connie's Quik Stop where it had been stolen three days before from Staci Thompson. The car had no license plate when it was recovered. Alabama law enforcement officers inventoried the car. Among other things, the officers found a set of keys, one of which fit a padlock that had been given to law enforcement officers by Cuelon Howard, the victim's wife, after the victim's murder-robbery; pieces of an ice cream cone; a spent .20 gauge no. 7 1/2 shotgun shell; and a Parisian department store charge receipt with Cuelon Howard's charge account number and Rayford Howard's signature on it.
Also on that same day, February 26, Brenda Mills found a wallet just off the U.S. Highway 231 and Ashville exit ramp from Interstate Highway 20. On February 27, at the same location, law enforcement officers discovered various other items, such as photographs, a driver's license, a Social Security card, an insurance card, and a pistol permit. The wallet and other items were subsequently identified as having belonged to the victim, Rayford Howard. A subsequent study of the items for fingerprints disclosed that two of the appellant's fingerprints were on the victim's driver's license.
It was subsequently discovered that Phyllis Guthrie, the appellant's sister, lived in a mobile home on Plaza Circle, the entrance to which was between Connie's Quik Stop (where Thompson's "Boss" Mustang had been stolen) and the Tiftonia Baptist Church (where Thompson's car had been recovered), approximately 1/10 of a mile from each. Two recoil pads suitable for use on a shotgun were found inside Phyllis Guthrie's mobile home. She denied ownership of the recoil pads. She told Tennessee law enforcement officers when the appellant had last been at her home (although the record does not disclose that information).
On March 6, 1988, the appellant and Harvey Lee Windsor were arrested at a Tennessee welcome station on Interstate Highway 24, approximately three miles from Phyllis Guthrie's mobile home. One of the men was wearing a black baseball cap. The appellant had a sawed-off shotgun within his reach, and Windsor had a .25 caliber pistol on his person.
Lauden Yates of the Alabama Department of Forensic Sciences examined the shotgun shells found at Howard's Store and in the black 1983 "Boss" Ford Mustang, the shotgun that the appellant had when he was arrested, and the recoil pads found at Phyllis Guthrie's mobile home. Yates determined that both shells had been fired from the same gun; however, they had not been fired from the shotgun taken from the appellant at the time of his arrest. One of the recoil pads was of a common variety and could have been used on any shotgun. The other recoil pad came from a Herrington Richardson shotgun.
Cuelon Howard, the victim's wife, testified regarding money missing from Howard's Store. The victim ran the store, and Mrs. Howard counted the money and kept the records for the store. She prepared $50 in specific denominations and change to open the store everyday. She testified that on February 25, the victim had four $100 bills in his wallet. After the victim's body was found, it was discovered that there was no currency in the register and that the victim's wallet and keys were missing. The $400 was not recovered with the victim's wallet. According to Mrs. Howard, currency in excess of that needed in the cash register to make change was kept in a drawer behind the cash register and was found undisturbed. At trial, Mrs. Howard identified the keys that had been found in *Page 920 
the stolen "Boss" Mustang as those having belonged to the victim.
The appellant did not testify and offered no evidence in his defense in either the guilt or sentencing phase of the trial. He appeals his conviction and death sentence, raising several issues.
On original submission, this court, pursuant to the plain error rule, A.R.App.P. 45A, remanded this case to the trial court with instructions to hold a hearing pursuant toBatson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69
(1986), and Powers v. Ohio, 499 U.S. ___, 111 S.Ct. 1364,113 L.Ed.2d 411 (1991). The trial court complied with our remand and duly filed a return.
 I.
The appellant contends that the state's evidence of robbery or attempted robbery was insufficient to sustain his conviction for the capital offense of murder committed during a robbery. He contends that Cuelon Howard's testimony regarding money missing from the victim's wallet and the cash register was inadequate to prove that any money had been taken. He also contends that evidence of his fingerprints on the victim's driver's license was inadequate to connect him with the robbery component necessary to make the offense a capital offense.
The evidence presented at trial was entirely circumstantial. That, however, "does not make it deficient; circumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused." Stephens v.State, 580 So.2d 11, 24 (Ala.Cr.App. 1990), aff'd, 580 So.2d 26
(Ala.), cert. denied, ___ U.S. ___, 112 S.Ct. 176,116 L.Ed.2d 138 (1991) (citation omitted).
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. United States v. Black, 497 F.2d 1039 (5th Cir. 1974); United States v. McGlamory, 441 F.2d 130 (5th Cir. 1971); Clark v. United States, 293 F.2d 445 (5th Cir. 1961)."
Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979); see also Stephens.
 "To sustain a conviction under § 13A-5-40(a)(2) for capital murder-robbery, the State must prove beyond a reasonable doubt: (1) a 'robbery in the first degree or an attempt thereof,' as defined by § 13A-8-41, (2) a 'murder' as defined by § 13A-6-2(a)(1), and (3) that the murder was committed 'during' the robbery or attempted robbery, i.e. that the murder was committed 'in the course of or in connection with the commission of, or in immediate flight from the commission of' the robbery or attempted robbery in the first degree. § 13A-5-39(2)."
Connolly v. State, 500 So.2d 57, 62 (Ala.Cr.App. 1985), aff'd,500 So.2d 68 (Ala. 1986).
Contrary to the appellant's contentions, we conclude that the state presented sufficient evidence for the jury to have reasonably concluded that the evidence excluded every reasonable hypothesis except that of the appellant's guilt of robbery in the first degree beyond a reasonable doubt. The record reflects that in excess of $400 was taken from the victim's wallet, along with an undetermined amount from the cash register. Moreover, the appellant's fingerprints were found on Howard's driver's license, which was found several miles from the scene of the crime and at the same location where Howard's wallet was found. Furthermore, the appellant was identified as having been seen in a distinctive black Mustang, which when it was impounded contained the shotgun shell, a charge receipt that had been signed by the victim, and keys that belonged to the victim.
We further find that there was sufficient evidence presented by the state for the jury to have reasonably concluded that the evidence excluded every reasonable hypothesis except that of the appellant's guilt of *Page 921 
Howard's murder and of the robbery that resulted in the killing beyond a reasonable doubt. The evidence of the appellant's guilt of the capital offense charged was strong and convincing.
 II.
The appellant contends that the trial court erred by allowing the state to introduce evidence of the collateral crime of the murder during a robbery of Randall Pepper in Colbert County. He summarizes the issue as follows:
 "The trial court committed reversible error in allowing the prosecution to introduce extensive evidence of Randall Pepper's death in Colbert County during its case-in-chief against Guthrie in St. Clair County over defense objection when such evidence was not applicable to the purposes for which the prosecution stated it was offered."
At trial, the state urged the admission of the evidence of the collateral crime on the grounds that it was relevant to prove intent and to prove a common plan, scheme or design. The trial court admitted the evidence without stating a ground for admission.
While the collateral offense evidence may not have been admissible based on the reasons offered by the prosecution at trial, we are not precluded from upholding the trial court's ruling on the admissibility of that evidence on a different ground. See Nicks v. State, 521 So.2d 1018, 1030-31
(Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied,487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988) (wherein the court stated that "a trial court will not be placed in error for assigning the wrong reason for a proper ruling, if that ruling is correct for any reason"). As will be discussed below, we affirm the trial court's ruling admitting the collateral offense evidence, but on a ground other than the grounds asserted by the prosecutor at trial.
The appellant correctly recognizes that "[i]n general, evidence of other or collateral crimes committed by a defendant is not admissible at his trial for a specific offense,"McLemore v. State, 562 So.2d 639, 641 (Ala.Cr.App. 1989). SeeBuchannon v. State, 554 So.2d 477 (Ala.Cr.App.), cert. denied,554 So.2d 494 (Ala. 1989); Nicks; C. Gamble, McElroy's AlabamaEvidence § 69.01(1) (4th ed. 1991). "This rule is generally applicable whether the other crime was committed before or after the one for which the defendant is presently being tried." C. Gamble, supra, at § 69.01(1).
 "However, Alabama law provides for the admissibility of evidence of collateral crimes or acts as part of the prosecution's case-in-chief if the defendant's collateral misconduct is relevant to show his guilt other than by suggesting that he is more likely to be guilty because of his past misdeeds. Brewer v. State, [440 So.2d 1155
(Ala.Cr.App. 1983)]. Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. These exceptions include the following:
 " '(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
 "Nelson v. State, 511 So.2d 225, 233
(Ala.Cr.App. 1986). See also Twilley v. State, 472 So.2d 1130 (Ala.Cr.App. 1985); Brewer v. State, supra; Miller v. State, 405 So.2d 41
(Ala.Cr.App. 1981); Thompson v. State, 374 So.2d 377
(Ala.Cr.App. 1978), aff'd, 374 So.2d 388 (Ala. 1979); McMurtrey v. State, 37 Ala. App. 656, 74 So.2d 528
(1954); Wilkins v. State, 29 Ala. App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); McElroy's §§ 69.01(1)-(11); Schroeder, Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984). All of the exceptions relate *Page 922 
to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950)."
Nicks, 521 So.2d at 1025-26. See Bradley v. State,577 So.2d 541 (Ala.Cr.App. 1990).
 "We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d at 1025. 'It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than showing his guilt through the medium of bad character.' C. Gamble, McElroy's Alabama Evidence § 69.0[1](1) (3d ed. 1977) (quoting Mr. Justice McElroy, 2nd ed.)
 " 'In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it.'
 Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270
(1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if 'it would serve comparatively little or no purpose except to arouse passion, prejudice, or sympathy of the jury,' Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App. 1985), or put another way, 'unless its probative value is "substantially outweighed by its undue prejudice," ' United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340
[107 L.Ed.2d 328] . . . (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir. 1978) (en banc), cert. denied, 440 U.S. 920 [99 S.Ct. 1244, 59 L.Ed.2d 472] . . . (1979))."
Bradley, 577 So.2d at 547-48. In Alabama, evidence "is relevant if there is any logical relationship between it and the ultimate inference . . . for which it is offered." C. Gamble,supra, at § 69.01(1).
In this case, the evidence offered of the collateral crime of the murder committed during a robbery in Colbert County was relevant to prove the identity of the person or persons who committed the instant murder-robbery in St. Clair County. The prosecution's case was completely circumstantial. The identity of the assailant or assailants was the central issue in the instant case. See Copeland v. State, 455 So.2d 951
(Ala.Cr.App.), cert. denied, 455 So.2d 956 (Ala. 1984); C. Gamble, supra, at § 69.01(8). However, in recognizing that the contested evidence was relevant to prove the identity of the perpetrator or perpetrators of the instant crime, we are mindful of the fact that the evidence of the Colbert County murder-robbery does not fit neatly within the identity exception to the general prohibition of collateral evidence, as this exception has been generally recognized by Alabama case law. This exception "contemplates the situation where the nowcharged crime was committed in a novel and peculiar manner and the state is allowed to show that the accused has committed other similar offenses, in the same novel and peculiar manner, in order to show him the perpetrator of the nowcharged crime," C. Gamble, supra, at § 69.01(8) (footnote omitted). Even though the instant offense and the Colbert County offense do not share a common modus operandi, we consider the evidence of the Colbert County offense to have been admissible because it was material and logically relevant to prove the identity of the person or persons who committed the instant murder-robbery.
In so holding, we find People v. Haston, 69 Cal.2d 233,70 Cal.Rptr. 419, 444 P.2d 91 (1968), superseded on other grounds, People v. Villalobos, 181 Cal.App.3d 310, 226 Cal.Rptr. 410 (1986), to be persuasive. In Haston, the California Supreme Court stated: *Page 923 
 "When, as in the instant case, a primary issue of fact is whether or not defendant rather than some other person was the perpetrator of the crime charged, evidence of other crimes is ordinarily admissible if it discloses a distinctive modus operandi common to both the other crimes and the charged crime. (See People v. Peete (1946) 28 Cal.2d 306, 319, 169 P.2d 924; People v. Adamson
(1964) 225 Cal.App.2d 74, 36 Cal.Rptr. 894; People v. Houston (1963) 219 Cal.App.2d 187, 33 Cal.Rptr. 26; People v. Scott (1963) 218 Cal.App.2d 249, 253-254, 32 Cal.Rptr. 225; People v. McCarty (1958) 164 Cal.App.2d 322, 323-328, 330 P.2d 484; see also and compare People v. Corral
(1964) 224 Cal.App.2d 300, 306, 36 Cal.Rptr. 591
.)
 " 'Several decisions have held that the test of admissibility of evidence of another offense offered to prove common design, plan, or modus operandi is whether there is some clear connection between that offense and the one charged so that it may be logically inferred that if defendant is guilty of one he must be guilty of the other.' (People v. Cramer (1967) 67 Cal.2d 126, 129, 60 Cal.Rptr. 230, 233, 429 P.2d 582, 585.) It is apparent that the indicated inference does not arise, however, from the mere fact that the charged and uncharged offenses share certain marks of similarity, for it may be that the marks in question are of such common occurrence that they are shared not only by the charged crime and defendant's prior offenses, but also by numerous other crimes committed by persons other than defendant. On the other hand, the inference need not depend upon one or more unique or nearly unique features common to the charged and uncharged offenses, for features of substantial but lesser distinctiveness, although insufficient to raise the inference if considered separately, may yield a distinctive combination if considered together. "Thus it may be said that the inference of identity arises when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses.
 ". . . The important point to be made is that, when such evidence is introduced for the purpose of proving the identity of the perpetrator of the charged offense, it has probative value only to the extent that distinctive 'common marks' give logical force to the inference of identity. If the inference is weak, the probative value is likewise weak, and the court's discretion should be exercised in favor of exclusion."
69 Cal.2d at 245-46, 247, 70 Cal.Rptr. at 426-28, 444 P.2d at 98-99, 100 (footnotes omitted; emphasis added). See also UnitedStates v. Myers, 550 F.2d 1036 (5th Cir. 1977); People v.Cavanaugh, 69 Cal.2d 262, 70 Cal.Rptr. 438, 444 P.2d 110
(1968), cert. denied, 395 U.S. 981, 89 S.Ct. 2139,23 L.Ed.2d 768 (1969); State v. Jones, 205 Conn. 638, 534 A.2d 1199
(1987); State v. Hatton, 95 Idaho 856, 522 P.2d 64 (1974);State v. Lee, 340 So.2d 1339 (La. 1976), cert. denied,431 U.S. 941, 97 S.Ct. 2658, 53 L.Ed.2d 260 (1977); Mayes v. State,95 Nev. 140, 591 P.2d 250 (1979); Bunch v. State, 605 S.W.2d 227
(Tenn. 1980). The Haston court found that both the charged and the uncharged crimes shared common characteristics with other armed robberies. However, the court found that one additional "mark," the involvement of Haston's codefendant in both the charged and the uncharged crimes, "considered singly or in combination set the offenses apart from other crimes of the same general variety and, . . . tend[ed] to suggest that the perpetrator of the uncharged [offense] was the perpetrator of the charged [offense]." 69 Cal.2d at 246, 70 Cal.Rptr. at 428, 444 P.2d at 100.
The rationale of Haston is applicable to this case. In this case, the evidence tended to show that both the Colbert County and the instant murder-robberies occurred on February 25, 1988, within eight hours of each other. The site of each *Page 924 
crime was a small convenience store and gas station located near a small town. Both victims were killed by shotgun blasts. Both victims' bodies were found behind the counter at the stores. Both victims were apparently alone, except for their assailant or assailants, at the time of the murders. Currency (not coins) from the register and the victim's wallet was taken in each case. We recognize that these facts alone do not necessarily set the two crimes apart from other murders committed during the robbery of convenience store/gas stations. However, the facts in this case offer two distinctive "marks" connecting the offenses — the participation of the codefendant Harvey Lee Windsor and the distinctive Ford Mustang that had been stolen from a convenience store near the trailer belonging to the appellant's sister two days before the murder-robberies. Moreover, the connection of these two offenses is firmly cemented by the constant intertwining of the two "marks" on February 24 and throughout the afternoon and evening of February 25.
Windsor was identified as the one who had supplied the license plate for the distinctive black Ford Mustang. This distinctive vehicle, linked to both the appellant and Windsor by various witnesses, can be traced by description and by the license plate number from Bobbie Sue Osborne's home to Sammie Sue Osborne's home, to the scene of the instant offense, through the state that afternoon, to the scene of the Colbert County murder-robbery. Windsor's presence with the appellant on the day of the instant offense and in the distinctive Mustang can be traced from Bobbie Sue's house between noon and 1:00 p.m. to Sammie Sue's residence shortly before and within five miles of the location of the instant crime. Thereafter, one witness observed a man carrying a "sawed off gun" get into the passenger side of a dark-colored car with tinted windows at the scene of the instant crime shortly before the victim's body was discovered. The presence of the Ford Mustang at the scene of the instant crime is further buttressed by the facts that the victim's keys and a department store charge slip were found in the vehicle after it was recovered and that shotgun shells found at the scene and in the vehicle had been fired by the same gun. After the instant offense, several witnesses observed the distinctive Ford Mustang travelling north with two occupants. Around 5:30 p.m. that same afternoon, a witness observed two occupants in the Ford Mustang at Tommy's Grocery Store, where one of them left a beer can that was subsequently found to have one of the appellant's fingerprints on it. One witness, who was at the scene of the Colbert County robbery before it occurred, saw the Ford Mustang parked outside the store where that murder occurred, saw the appellant inside, and saw another man sitting half-inside the Mustang and eating an ice cream cone. Another witness, immediately after hearing a shotgun blast, saw Windsor and the Mustang at the scene. Windsor's presence in the Ford Mustang while it was parked at the scene of the Colbert County murder-robbery was further supported by the fact that pieces of an ice cream cone were found in the Mustang when it was recovered. Finally, Windsor and the appellant were arrested together only three miles from where the distinctive black Mustang had been abandoned.
The above facts surrounding the two distinctive "marks" certainly present "some clear connection between the [Colbert County] offense and the one charged so that it may be logically inferred that if [the appellant] is guilty of one he must be guilty of the other," People v. Haston, 69 Cal.2d at 245, 70 Cal.Rptr. at 427, 444 P.2d at 99.
The evidence of the Colbert County crime was certainly "material and logically relevant" to the issue of identity because it logically, naturally, and by reasonable inference tended to shed light on the issue of whether the appellant committed the instant crime. See Bradley, 577 So.2d at 548. Its probative value clearly outweighed it prejudicial effect. "The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the state's case-in-chief rests within the sound discretion of the trial judge." Blancov. *Page 925 State, 515 So.2d 115, 120 (Ala.Cr.App. 1987); Nicks, 521 So.2d at 1026; McGhee v. State, 333 So.2d 865, 868 (Ala.Cr.App. 1976). We hold that the trial court did not abuse its discretion by allowing the state to introduce evidence regarding the Colbert County murder-robbery.
 III.
The appellant contends that the trial court erred by admitting a photocopy of the photographic array (state's exhibit no. 31) that had been shown to Michael Maxwell, a witness who identified the appellant as one of the two men he had seen at the scene of the Colbert County murder-robbery just before its occurrence. The appellant asserts that the array contained "mug shots," that it was suggestive, that a proper foundation had not been laid for its admission, that it was hearsay, and that it was not the "best evidence."
At trial, Maxwell testified that he saw two men inside the Chisca gas station when he arrived — Randall Pepper, the victim, and another man whom he did not know; that he was in the store "[j]ust a few minutes" and that he pumped his gas outside; and that when he left, the man was standing in front of the black Mustang. Maxwell identified the appellant in court as the man he had observed inside the station and outside in front of the Mustang.
On cross-examination of Maxwell, in reference to the appellant's identity, the following occurred:
 "Q. What about the person that you saw inside, how was he [dressed]?
 "A. He was wearing jeans and seemed like he had a jacket on, too.
"Q. Do you remember what color it was?
"A. No.
"Q. Do you remember what color his shirt was?
 "A. No. He had a baseball cap on. I don't remember his shirt.
"Q. What color was his hair?
"A. His hair was dark brown or black.
 "Q. Was anything else unique or distinctive about the individual that you saw in the store?
 "A. Well, he was about 5'10", maybe a little taller. He had a few whiskers on his face, you know. [It] wasn't a full beard, but he had whiskers on his face.
"Q. Did you have any conversation with the person?
"A. No.
 "Q. Are you absolutely positive beyond a doubt that this gentleman here is the person you saw there that day?
 "A. He looks like to me the man that was in there when I walked in.
"Q. You are not positive, are you?
"A. Not positive? I'm positive as I can be.
 "Q. Well, are you positive, or just as positive as you can be?
 "A. He looks like the man that was standing there whenever I walked in.
 "Q. I thought you said the man you saw up there had a beard?
 "A. He did. That man's had a shave. He favors him. He looks just like him. You take from here up, he looks like him. If the other man has got a different chin and all, then the man that was in there, if he has a broke jaw or something, he is not the same man.
 "Q. What color cap did the man you saw in there have on?
"A. It was a baseball cap. I don't know.
 "Q. Have you not been shown some pictures of this man and advised he would be the man here in the courtroom today for you to identify?
"A. Been shown pictures of him?
"Q. Yes.
"A. What you mean? When? Today?
 "Q. I'm just asking you, have you been shown some pictures of this man and told this would be the man here that you would be here to identify?
 "A. Yes. No, I wasn't told I would be here to identify him.
"Q. What were you told?
 "A. He told me to pick him out in the same layout. He showed it to me, and I *Page 926 
picked him out in there. He said, well, he is changed now, he don't have a beard.
"Q. You were told this man wouldn't have a beard?
"A. Yes, sir.
 "Q. Would you have recognized him if you hadn't been told that?
 "A. If I had walked up to him on the street, I don't know.
"MR. HAMLIN: No further questions."
During Maxwell's re-direct examination, he testified that during the investigation of this offense Doug Hargett of the Colbert County Sheriff's office had shown him some photographs. Maxwell identified state's exhibit no. 31 as the photographic array that Hargett had shown him. He also identified the picture that he had picked at that time — on the bottom left side of the first page.
At trial, Doug Hargett identified state's exhibit no. 31 as a photocopy of the photographic array that he had shown Maxwell on April 8, 1988. He testified that Maxwell picked the bottom left picture on the first page, which was that of the appellant. He also testified that when he showed Maxwell the photographs, each was framed in a manner that covered the names and the photograph showing the appellant in profile was covered.
 A.
The appellant argues that the admission of the copy of the photographic array does not meet the test of admissibility for "mug shot" type photographs set forth in Holsclaw v. State,364 So.2d 378 (Ala.Cr.App.), cert. denied, 364 So.2d 382
(Ala. 1978). The appellant, however, failed to object on the ground that the photographs are "mug shot" type photographs. However, because this is a death penalty case, we must determine whether this issue amounts to "plain error." SeeMurry v. State, 562 So.2d 1348 (Ala.Cr.App. 1988); A.R.App.P. 45A.
Under Rule 45A, we are required in a case where the death penalty has been imposed to notice any plain error or defect in the proceedings, whether or not brought to the attention of the trial court, and to take appropriate action whenever such error has or probably has adversely affected a substantial right of the appellant. In interpreting and applying Rule 45A, the Alabama Supreme Court has looked to the definition in the Federal Rules of Criminal Procedure of "plain error" and to the cases interpreting the federal plain error rule. It has held that " 'plain error' only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings," Ex parteWomack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986,104 S.Ct. 436, 78 L.Ed.2d 367 (1983) (quoting United States v.Chaney, 662 F.2d 1148, 1152 (5th Cir. 1981)).
"Mug shots are generally inadmissible in a criminal trial because the jury may infer from them that the defendant has a criminal history." Ex parte Long, 600 So.2d 982, 989 (Ala. 1992) (citation omitted). See Webb v. State, 539 So.2d 343, 348
(Ala.Cr.App. 1987). In Holsclaw, this court adopted the analysis set forth in United States v. Harrington, 490 F.2d 487 (2d Cir. 1973) of the test of admissibility of "mug shot" type photographs. Recently, the Alabama Supreme Court adopted theHarrington criteria and stated that the "failure to meet one or more of these criteria would not necessarily result inreversible error," Ex parte Long, 600 So.2d at 989. The court, in Harrington, set forth the rule as follows:
 "We perceive three prerequisites to a ruling that the introduction of 'mug shot' type photographs does not result in reversible error:
 "1. The Government must have a demonstrable need to introduce the photographs; and
 "2. The photographs themselves, if shown to the jury, must not imply that the defendant has a prior criminal record; and
 "3. The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs." *Page 927 
490 F.2d at 494. See also Long; Holsclaw; C. Gamble, McElroy'sAlabama Evidence § 123.07 (4th ed. 1991).
Applying this test to the facts of the instant case, we conclude that the state had "a demonstrable need to introduce the photographs" and testimony regarding Maxwell's pre-trial identification for two reasons. First, "the identification of the appellant as the assailant was a 'contested issue of fact.' " Lewis v. State, 488 So.2d 1362, 1367 (Ala.Cr.App. 1986). In this case, as in Lewis, the issue regarding the photographic array was initially brought out by defense counsel during his cross-examination of a state's witness as to the reliability of that witness's in-court identification. "Because defense counsel opened the door to the testimony concerning the identification of the assailant by way of the photographic array, it was proper for the trial court to admit the photographic display into evidence 'to rebut the inference that the appellant was not the assailant.' " Id. Second, although Maxwell had already identified the appellant in court, vigorous cross-examination undermined the reliability of his identification; therefore, the state was entitled "to rehabilitate the testimony of [Maxwell] by showing [his] ability, on a previous occasion, to point out the accused,"Grace v. State, 431 So.2d 1331, 1334 (Ala.Cr.App. 1982). SeeGross v. State, 395 So.2d 485 (Ala.Cr.App. 1981); Carlisle v.State, 371 So.2d 975 (Ala.Cr.App. 1979); C. Gamble, supra, at § 177.01(6)(a).
Because the photographs were shown to the jury, we must next determine whether the photographs implied that the appellant had a prior criminal record. The photographs are not the typical "mug shots" condemned in Holsclaw. Each of the six pictures is a frontal view of a bearded, white male in front of a height chart. Three of the pictures have written on them the photographed individual's biographical information, such as the name, date of birth, social security number, height, weight, hair color, and eye color. Writing on one of these three pictures states that the subject was charged with driving while under the influence of alcohol. This information was concealed when the photographs were shown to the jury. Two of the pictures have nothing written on them. The sixth photograph — that of the appellant — is surrounded on two sides by blank paper that has been secured by tape; although a profile view was included, only the frontal view of his face is visible. Under the facts of this case, we are unwilling to say that these pictures imply that the appellant had a prior criminal record. These are not photographs, like those in Holsclaw andHarrington, that gave the jury both profile and frontal views, the name of the arresting police department, and a police identification number. Rather, the jury saw only a frontal view of a subject before a height chart. For similar fact situations, see Parker v. State, 587 So.2d 1072
(Ala.Cr.App. 1991) (photograph depicting frontal view of appellant standing in front of a height chart was admissible), and Williamson v. State, 384 So.2d 1224, 1231 (Ala.Cr.App. 1980) (same).
"The mere fact that [police] officers . . . had [the] appellant's photograph in their possession does not convey the same damaging impression to the jury as a 'mug-shot.' "Grace, 431 So.2d at 1335. Moreover, "[b]y the same token, the fact that [the] appellant was photographed and questioned by the police does not lead to the conclusion that he was a previously convicted felon." Id. Furthermore, and most importantly, the jury heard from the witness stand that the appellant was arrested on March 6, 1988, and that Maxwell made the pre-trial identification on April 8, 1988. Thus, the jury could have reasonably inferred that the appellant's picture was made as a result of the offense for which he was being tried
rather than as a result of past criminal activity. SeeHarrington, 490 F.2d at 498 (Friendly, J. dissenting); UnitedStates v. Calarco, 424 F.2d 657 (2nd Cir.), cert. denied,400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 53 (1970); cf. Chunn v.State, 339 So.2d 1100 (Ala.Cr.App. 1976) (photograph bore the same date as the appellant's confession; therefore, the jury would not have necessarily concluded from *Page 928 
seeing photograph that the appellant had a prior criminal record).
Finally, we must determine whether the manner of introduction of the photographs focused particular attention on their source or on any implication arising from the photographs. There was no testimony that the individuals pictured shared any common characteristic other than the fact that they were bearded, white males standing in front of height charts. The photographs were not identified as "mug shots." Maxwell simply testified that Hargett had showed him some photographs. For a similar situation, see Walker v. State, 523 So.2d 528, 535-36
(Ala.Cr.App. 1988) (no mention that photographs were mug shots and witness simply testified that investigating officer had showed him some photographs; therefore, no attention was drawn to the source or implication of the photographs). Thus, by the manner of the introduction of the photographs, no particular attention was drawn to the source or implications of the photographs.
Accordingly, we find that the introduction of the photographic display was not error, much less plain error.
 B.
The appellant contends that the trial court erred by admitting a photocopy of the photographic display from which Maxwell identified him because, he says, the state failed to lay a proper foundation for its admission. As previously discussed, both Maxwell and Hargett identified state's exhibit no. 31 as the display that Hargett had showed Maxwell. They also testified that Maxwell pointed to the bottom left picture on this first page as a photograph of one of the men Maxwell had seen at the scene of the Colbert County murder-robbery.
This court has held that, "[to] allow the introduction of an out-of-court photographic array, the state only need show a reasonable probability that the photographs introduced at trial were those used by the witness for identification purposes."Wright v. State, 423 So.2d 345, 347 (Ala.Cr.App. 1982) (citingSnipes v. State, 364 So.2d 424 (Ala.Cr.App. 1978)). Furthermore, "photographs are typically admissible if they are 'properly verified by a person who is familiar with the subject of the photographs.' " Young v. State, 563 So.2d 44, 46
(Ala.Cr.App. 1990) (quoting Whittington v. State, 432 So.2d 25,26 (Ala.Cr.App. 1983)). Both witnesses testified that the photographic array was the same one shown at the time of the pre-trial identification; therefore, the state met the "reasonable probability" burden. Thus, this argument is without merit.
 C.
The appellant argues that the pretrial photographic display was unduly suggestive. At trial, his objection was stated in pertinent part as follows:
 "First of all, the photographs, the one here that's been identified is the only one of the nature showing both a front and profile. That in my opinion would be suggestive of the one they might want picked out. All of the others are a frontal, facial view of an individual, two looks like almost the same individual, I don't guess they are. None of these has any similarity to this picture. It is a different size, and the characteristics of the photograph are even different."
In Young v. State, 563 So.2d at 46, we stated the following:
 "When a party challenges a pre-trial identification, this court must apply a two-part analysis. First, we must determine if the identification procedure was unnecessarily suggestive. Johnson v. State, 526 So.2d 34
(Ala.Cr.App. 1987); Coleman v. State, 487 So.2d 1380, 1387 (Ala.Cr.App. 1986). [Second, i]f we find that the lineup was unnecessarily suggestive, then we must review the 'totality of the circumstances' (five factors) as set out in Neil v. Biggers, 409 U.S. 188 [93 S.Ct. 375, 34 L.Ed.2d 401] . . . (1972)."
Furthermore, "[p]re-trial identifications are to be set aside on grounds of prejudice only if the pre-trial identification is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification." Ex parte Stout,547 So.2d 901, 904 (Ala. *Page 929 
1989) (citing Scott v. State, 479 So.2d 1343
(Ala.Cr.App. 1985)).
The record reflects that, at the time of the pretrial identification, the photographs were placed in a folder, and framing was placed around each photograph so that only the frontal facial portion of each photograph was visible. Names and personal data were covered. Each photograph was that of a bearded, white male. The appellant's photograph, picked by Maxwell, showed only a front facial view, as did the other photographs. It is, however, smaller than the others and was taken in front of a different height chart.
Having reviewed the photographs and the evidence of the circumstances under which they were displayed, we find that the appellant has failed to show that the pre-trial identification was unduly suggestive. Therefore, we need not apply the analysis of Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375,34 L.Ed.2d 401 (1972).
 D.
The appellant argues that the trial court erred by admitting state's exhibit no. 31, a photocopy of the pictures in the photographic display, into evidence over his "best evidence" objection. At trial, the state requested that it be allowed to offer the original photographs and substitute the copy, presumably because the pictures were needed for the other prosecutions stemming from the murder-robberies. Both at trial and in brief, the appellant fails to state how the admission of state's exhibit no. 31 violated the best evidence rule and how he was harmed by the alleged violation of the rule. Because the appellant's best evidence objection was sustained and, thus, he has no adverse ruling for this court to review, Maul v. State,531 So.2d 35 (Ala.Cr.App. 1987), this issue must be addressed under the plain error standard.
Assuming that he is objecting because the exhibit is a photocopy of the photographic display, his argument is without merit. "The best evidence rule requires a party who wishes to prove the terms or contents of a writing to introduce the original into evidence if available." Spurgeon v. State,560 So.2d 1116, 1123 (Ala.Cr.App. 1989) (quoting Howton v. State,391 So.2d 147 (Ala.Cr.App. 1980)). In the instant case, the best evidence rule is not applicable because the state was not attempting to prove the contents of the photograph, but rather was showing the jury that the witness identified the appellant as he was pictured in the photographic display. Furthermore, if the appellant was objecting to the original photographs themselves as not being the best evidence, this court has held that the best evidence rule applies only to documentary evidence and not photographs. See Whittington v. State,432 So.2d 25, 26 (Ala.Cr.App. 1983). Accordingly, we find that no error regarding this issue was committed, much less plain error.
 E.
The appellant argues that the trial court erred by admitting state's exhibit no. 31 because "[i]t call[ed] for hearsay." However, the appellant has failed both at trial and in brief to explain how the admission of this exhibit was inadmissible hearsay.
Because the appellant failed to secure a ruling on his hearsay objection, this issue is reviewed under the plain error standard. Hearsay is "an out-of-court statement . . . offered to prove the truth of the matter asserted." Holloway v. State,561 So.2d 1119, 1121 (Ala.Cr.App. 1990) (citing C. Gamble,McElroy's Alabama Evidence § 242.01(1) (3d ed. 1977)). The admission of the photographs simply does not violate this rule. We find no violation of the hearsay rule. There was no error, much less plain error.
 IV.
The appellant argues that the trial court erred by overruling his objection to the prosecutor's vouching for the credibility of the state's witnesses. During the state's closing argument in the guilt phase, the following occurred:
 "[MR. DAVIS (Prosecutor)]: You heard some 42 state witnesses testify from that *Page 930 
stand over the course of four days. And I'll tell you this, I vouch for the credibility of everyone of them. If there are any of them that you felt like got up here and wilfully lied to you, you can throw their evidence out. I submit to you that none of them lied to you. They told you the truth and they are doing their job.
 "MR. HAMLIN [Defense Counsel]: Your Honor, I object to the District Attorney that he is vouching for the credibility of the witnesses.
 "MR. DAVIS: I have to vouch for them when I call them as my witnesses. That's an elementary rule of law.
 "MR. HAMLIN: That's an improper remark to make in front of the jury.
"MR. DAVIS: I take issue with that.
"THE COURT: Go ahead. I overrule the objection.
 "MR. DAVIS: I vouch for my witnesses, everyone of their credibility. I'm proud of everyone that I put on the stand in this case."
This court has previously held as follows:
 "[I]t is highly improper for attorneys, particularly prosecutors, to state their personal opinions during closing arguments. Moseley v. State, 448 So.2d 450 (Ala.Cr.App. 1984). Attorneys must be careful to refrain from injecting their own personal experience or knowledge in support of their argument, as distinguished from what they deem to be reasonable inferences to be drawn from the evidence. Moseley, supra; Brown v. State, 393 So.2d 513 (Ala.Cr.App. 1981)."
King v. State, 518 So.2d 191, 193 (Ala.Cr.App. 1987). Cf. Crossv. State, 536 So.2d 155, 160 (Ala.Cr.App. 1988) (prosecutor may argue the effect of a witness's testimony, but may not vouch for his or her credibility). This court, in discussing vouching for the credibility of witnesses by the prosecutor in a death penalty case, has stated the following:
 " 'Attempts to bolster a witness by vouching for his credibility are normally improper and error.' United States v. Ellis, 547 F.2d 863, 869 (5th Cir. 1977). The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility. United States v. Roberts, 618 F.2d [530], 537 (9th Cir. 1980) (citing Ellis, supra). This test may be satisfied in two ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity. See United States v. Lamerson, 457 F.2d 371, 372 (5th Cir. 1972); Gradsky v. United States, 373 F.2d 706, 709-10 (5th Cir. 1967). Secondly, a prosecutor may implicitly vouch for the witness' veracity by indicating that information not presented to the jury supports the testimony. See United States v. Booklier, 685 F.2d 1208, 1218 (9th Cir. 1982) (explaining United States v. Roberts, 618 F.2d 530 (9th Cir. 1980))."
Parker v. State, 587 So.2d 1072, 1094 (Ala.Cr.App. 1991) (quoting United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304,79 L.Ed.2d 703 (1984)).
 "The underlying reasoning for this vouching prohibition was best explained by the Court in United States v. Young [, 470 U.S. 1, 18, 105 S.Ct. 1038, 1047-48, 84 L.Ed.2d 1 (1985),] as follows:
 " '[S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence. See Berger v. United States, 295 U.S. [78,] 88-89 [55 S.Ct. 629, 633, 79 L.Ed. 1314] . . . (1935).' "
United States v. Diloreto, 888 F.2d 996, 999 (3rd Cir. 1989). "The prohibition against vouching does not forbid prosecutors from arguing credibility, which may be central to the case; rather, it forbids arguing credibility based on the reputation of the government office or on evidence not *Page 931 
before the jury." United States v. Hernandez, 921 F.2d 1569,1573 (11th Cir.), cert. denied, ___ U.S. ___, 111 S.Ct. 2271,114 L.Ed.2d 722 (1991).
In the instant case, the remarks of the prosecutor, vouching for the credibility of the state's witnesses, were clearly erroneous. He stated, in the strongest language, his personal belief in the witnesses' credibility. He placed the prestige of the state behind the witnesses by giving explicit personal assurances of their veracity. He wrongfully contended that his comments were legally authorized and required. We also believe that the comments of the prosecutor, taken as a whole, could reasonably have led the jury to believe that the prosecutor possessed additional reasons for knowing that the state's witnesses testified truthfully, reasons not known to the jury. The following comments, when considered together, could have reasonably led a juror to believe that the prosecutor, in vouching for the credibility of his witnesses, had information that had not been presented to the jury which supported the witnesses' testimony: "I vouch for the credibility of everyone of them"; "[t]hey told you the truth and they are doing their job"; "I have to vouch for them when I call them as witnesses"; "[t]hat's an elementary rule of law"; and "I'm proud of everyone I put on the stand." Here the prosecutor threw the weight of his office behind the witnesses' testimony and implicitedly vouched for the witnesses by implying that information not before the jury supported the witnesses' credibility. Thus, the overruling of the appellant's objection to these comments by the prosecutor constituted error.
After finding error, an appellate court may still affirm a conviction on the ground that the error was harmless, if indeed it was. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824,17 L.Ed.2d 705 (1967); Sattari v. State, 577 So.2d 535
(Ala.Cr.App. 1990), cert. denied, 577 So.2d 540 (Ala. 1991); A.R.App.P. 45. The harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala. 1983);Henderson v. State, 583 So.2d 276 (Ala.Cr.App. 1990), aff'd,583 So.2d 305 (Ala. 1991), cert. denied, ___ U.S. ___,112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565
(Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala. 1986), cert. denied,486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). In determining whether, under the facts and circumstances of this case, the erroneous comments of the prosecutor were harmless, we look to the standards set forth in Chapman v. California, and A.R.App.P. 45. In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict. In order for the error to be deemed harmless under Rule 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights.
Applying the harmless error analysis prescribed byChapman and Rule 45 to this issue, in light of the entire record, we cannot find that the comments of the prosecutor, vouching for the credibility of the state's witnesses, were harmless. We reach this conclusion with knowledge that the evidence of guilt, although completely circumstantial, is strong and convincing. The proper inquiry here is not whether the evidence of guilt is overwhelming, but whether a substantial right of the appellant has or probably has been adversely affected. See Ex parte Lowe, 514 So.2d 1049
(Ala. 1987); Carroll v. State, 599 So.2d 1253 (Ala.Cr.App. 1992). We cannot say that the error did not contribute to the verdict beyond a reasonable doubt. We conclude that the error adversely affected a substantial right of the appellant. Rule 45. For this reason, the judgment is due to be reversed and the case remanded to the trial court for a new trial.
 V.
The appellant contends that the following comment by the prosecutor during closing argument at the sentencing phase of the trial constituted reversible error: "When I first became involved in this case, from the very day, the State of Alabama, the law enforcement agencies and everybody agreed that this was a *Page 932 
death penalty case, and we still stand on that position." He contends that the prosecutor argued facts not in evidence. The appellant did not object to this comment at trial; therefore, we must review this issue under the plain error rule of A.R.App.P. 45A.
After reviewing the record in this case, we find that the above-quoted comment was based on facts not in evidence and that it constituted an error so obvious that failure to notice it would seriously affect the fairness or integrity of the proceedings. Ex parte Womack. We further find that the erroneous comment "has or probably has adversely affected the substantial right of the appellant." Rule 45A. The comment of the prosecutor to the jury that the state, law enforcement agencies, and "everybody" had agreed on the date that the prosecutor first became involved, that the case was a "death penalty case," is an assertion of facts unsupported in the evidence and, irrelevant to any issue in the case. The prosecutor improperly implied to the jury that the prosecutor's office, law enforcement agencies, and everybody else, which could be interpreted as all officials involved as well as the general public, had already made the careful judgment that the case warranted the death penalty. The comment can reasonably be interpreted as an effort to lead the jury to believe that the whole governmental establishment had already determined that the sentence should be death and to invite the jury to adopt the conclusion of others, ostensibly more qualified to make the determination, rather than deciding on its own. We see this as a clear infringement upon the jury's important and critical discretion in determining whether to recommend a sentence of death or of life imprisonment without parole. For a discussion of this type of argument, which is commonly referred to as the "prosecutorial expertise argument," in the sentencing phase of death penalty cases, see Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985), vacated on other grounds, 478 U.S. 1016,106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), reinstated, 809 F.2d 700 (11th Cir. 1987), and cases cited therein.
 "Because the jury is empowered to exercise its discretion in determining punishment, it is wrong for the prosecutor to undermine that discretion by implying that he, or another high authority, has already made the careful decision required. This kind of abuse unfairly plays upon the jury's susceptibility to credit the prosecutor's viewpoint."
Id. at 1410.
We therefore conclude that the erroneous comment of the prosecutor constituted plain error, which requires reversal of this case. We are convinced that a failure to act upon this error in this case would seriously affect the fairness or integrity of the proceedings and would deny the appellant a substantial right. We cannot say that the jury, in making its sentencing recommendation, was not influenced by the erroneous comments of the prosecutor. It is probable that they were affected. After reviewing the entire record, we believe that the comment denied the appellant a fundamentally fair sentencing hearing.
For the reasons stated in parts IV and V above, we reverse the judgment and remand this case for a new trial. Although we are reversing based on parts IV and V, we addressed the issues in parts I, II, and III, because these issues may arise again in a retrial. We omitted addressing the Batson and Powers
issue, which claimed that the prosecutor exercised certain of his jury strikes in a racially discriminatory manner, because it is unlikely that this issue will arise again in a retrial and, if it does, it will arise out of different facts.
REVERSED AND REMANDED.
All Judges concur. *Page 933 
[1] Harvey Lee Windsor was convicted and was sentenced to death in St. Clair Circuit Court (CC-88-115) for the capital offense of murder committed during the course of a robbery for his participation in the offense that is the subject of this appeal. His case is pending on appeal in this court.
[2] The appellant and Windsor were both convicted of the murder-robbery of Randall Pepper and were sentenced to death. Both convictions, however, were reversed on appeal — the appellant's based on the principles of Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Ex parte Branch,526 So.2d 609 (Ala. 1987), and Powers v. Ohio, 499 U.S. ___,111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), and Windsor's based on the prosecutor's comment on Windsor's failure to testify. SeeGuthrie v. State, 598 So.2d 1013 (Ala.Cr.App. 1991), cert. denied, 598 So.2d 1020 (Ala. 1992); Windsor v. State,593 So.2d 87 (Ala.Cr.App. 1991). These cases are awaiting retrial.